**Pierre BAZILE, Plaintiff,**

v.

**CITY OF NEW YORK,
et al., Defendants.**

**No. 99CIV1325VMMHD.**

United States District Court,
S.D. New York.

Aug. 2, 2002.

Pierre Bazile, East Elmhurst, NY, Pro se.

Tania M. Torno, Michael D. Hess, Corporation Counsel of the City of NY, New York City, for Defendants.

### DECISION AND AMENDED ORDER

MARRERO, District Judge.

On February 23, 1999, Plaintiff Pierre Bazile (hereinafter "Bazile"), an officer of the New York City Police Department, filed this action, alleging, *inter alia,* that he was subjected to a hostile work environment and retaliation by defendants in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (hereinafter "Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 (hereinafter "NYHRL"), as well as a denial of equal protection, in violation of 42 U.S.C. § 1983. The defendants, including the City of New York, the New York City Police Department (hereinafter the "NYPD"), Captain William Morris, Captain Jeffrey Behrens, Captain Charles Fries, Captain Stephen Donnelley, and Lieutenant Thomas Barry (hereinafter collectively, the "Defendants"), move for summary judgment, asserting that Bazile has not presented sufficient facts to raise a triable issue in support of his claims. On May 10, 2002, Magistrate Judge Michael H. Dolinger, to whom the matter had been referred for pretrial purposes and dispositive motions, issued a Report and Recommendation (hereinafter the "Report") which recommended the dismissal of Bazile's claims. A copy of the Report is

attached hereto and incorporated herein. On May 29, 2002, Bazile filed objections to the Report, asserting that: (1) he presented evidence sufficient to establish an issue of material fact regarding his hostile work environment and retaliation claims; and (2) Magistrate Judge Dolinger improperly excluded the expert testimony of Michael Levine (hereinafter "Levine"). Having conducted a *de novo* review of the portions of the Report to which Bazile objects,[1] the Court issued an Order on June 27, 2002 granting Defendants' motion for summary judgment and indicating that the Court's reasoning would be detailed in a subsequent Order. The June 27, 2002 Order is amended to incorporate the reasons set forth below as the basis for the Court's conclusion that Bazile failed to establish any genuine issues of material fact. Accordingly, the Court grants the Defendants' motion for summary judgment.

## I. *FACTUAL BACKGROUND*

Bazile's claims arise from an incident on May 22, 1997, in which he shot a small pit bull in the lobby of an apartment building in Far Rockaway, Queens, and the subsequent disciplinary actions against him taken by the NYPD. The incident occurred while Bazile, an officer of the NYPD for four years, was off-duty working as a security guard. (*See* Dep. of Pierre Bazile, dated June 2, 2000 (hereinafter "Bazile Dep."), attached as Ex. 2 to the Declaration of Bryan D. Glass, dated June 27, 2000, (hereinafter the "Glass Decl."), at 43, 49–50.) Bazile discharged his gun eleven times as the dog approached him, and several bullets ricocheted, with one bullet striking Bazile in the face, and another lodging in the bicycle tire of a boy who had just entered the lobby. (*See id.* at 119–20.)

Because Bazile had discharged his revolver, a follow-up investigation was required. (*See* Letter from Maureen B. Godfrey, NYPD Law Intern to William Lai, Enforcement Supervisor, U.S. Equal Opportunity Commission (hereinafter "Godfrey Letter"), dated June 17, 1998, attached as Ex. L to the Glass Decl., at 2–3.) The NYPD conducted the investigation and later commenced disciplinary proceedings against Bazile. The investigation revealed that Bazile had violated several rules of the Patrol Guide Procedure, which governs the conduct of NYPD police officers. More specifically, two relevant provisions of the Patrol Guide Procedure provide that police officers shall not: (1) discharge their weapons when doing so will unnecessarily endanger innocent persons; or (2) discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat. (*See id.* at 5.)

On September 30, 1997, the Discharge Review Board, which reviews all firearms discharges by NYPD police officers, concluded that Bazile had violated these guidelines. (*See* Letter of Findings and Recommendations from the Patrol Borough Queens South (hereinafter "P.B.Q.S.") Firearms Discharge Review Board Chairman to the Dep't Firearms Discharge Review Board Chairman, dated Sept. 30, 1997, attached as Ex. Q to the Godfrey Letter, at 1.) On December 2, 1997, the Chief of the NYPD concurred, and on March 31, 1998, Bazile was formally charged with violating the two provisions described above. (*See* Letter of Findings of Dep't Firearms Discharge Review Board, from the Chief of the Dep't to

---

1. *See* 28 U.S.C. § 636(b)(1)(B); *U.S. v. Tortora*, 30 F.3d 334, 337 (2d Cir.1994) ("'[A] judge of the court shall make a *de novo* determination of those portions of the report … or recommendations to which objection is made.'").

the Commanding Officer of the P.B.Q.S., dated Dec. 2, 1997, attached as Ex. C to the Glass Decl., at 1.)

Pending the completion of the investigation and the disciplinary proceedings, the NYPD placed Bazile on modified duty in the Brooklyn Court Section, and later on foot patrol in a unit he characterizes as predominantly comprised of minorities. (*See* Pl.'s Objections to Magistrate Dolinger's Report and Recommendation (hereinafter "Pl.'s Objections"), dated May 29, 2002, at 3.) Due to the nature of the incident and the unusual response of Bazile, the Discharge Review Board felt that it was necessary to require Bazile to be evaluated by NYPD Psychological Services. (*See* Dep. of Douglas Ziegler, dated May 15, 2000, attached as Ex. EE to the Glass Decl., at 19, 21–22, 49–50.) Bazile alleges that these actions by the Defendants were motivated by his race and national origin. (*See* Verified Am. Compl., dated Apr. 16, 1999, at ¶¶ 59, 63, 70, 78, 83.)

Bazile spoke with a reporter from the *Daily News* about his situation, which resulted in an article describing his long wait for formal charges to be filed. (*See* Gene Mustain, Probe Dogging Cop in Pitt Bull Shooting, *Daily News*, Dec. 21, 1997, attached to the Glass Decl. as Defs.' Ex. D (hereinafter *"Daily News"*).) Bazile also sent a number of letters describing his situation to NYPD supervisors as well as to public officials. (*See, e.g.*, Letter from the President of the Borough of Queens Claire Shulman to NYPD Commissioner Howard Safir, dated January 14, 1998, attached as Ex. F to the Glass Decl., at 1.) On January 20, 1998, Bazile filed a complaint with the Equal Employment Opportunity Commission (hereinafter the "EEOC"). His EEOC complaint focused exclusively on: (1) the length of his modified duty assignment in the Brooklyn Court Section; (2) an alleged unnecessary delay in the NYPD's investigation; and (3) the referral for a psychological evaluation. (*See* Pl.'s Compl., dated Feb. 23, 1999, at 15–17.) On November 30, 1998, the EEOC dismissed Bazile's complaint and sent him a right to sue letter stating, "there is no evidence supporting your contentions that the laws enforced by the [EEOC] were violated," and that "it is unlikely that the [EEOC] would find a violation if it invested additional resources in this matter." (*See* Letter from EEOC Enforcement Manager Harold F. Wilkes to Bazile, dated Nov. 30, 1998, attached as Ex. S to the Glass Decl., at 1.)

## II. *BAZILE'S OBJECTIONS*

Bazile objects to the Report in its entirety, claiming that it fails to address the majority of his factual allegations as well as the supporting evidence regarding the adverse employment actions that the Defendants took against him. Bazile first asserts that his Title VII hostile work environment and retaliation claims should not be dismissed on summary judgment because he presented evidence sufficient to establish issues of material fact. (*See* Pl.'s Objections at 2.) He further asserts that his hostile environment and retaliation claims under NYHRL and 42 U.S.C. § 1983 should not be dismissed on summary judgment for similar reasons. (*See id.* at 12.) Additionally, Bazile objects to the exclusion of Levine's expert testimony. (*See id.* at 6.) Having reviewed and considered Bazile's objections in light of the record before it, this Court concludes that all of Bazile's objections are meritless.[2]

---

**2.** Bazile further objects to numerous findings of the Magistrate Judge. However, he fails to support his objections with evidence either that the NYPD's actions were motivated by race or national origin, or that his behavior qualified as protected activity. Therefore, the Court need not consider these additional, unsubstantiated allegations. *See* F.R.C.P. 72(b) ("[A] party may serve and file *specific,* written

## III. DISCUSSION

### A. HOSTILE WORK ENVIRONMENT

 In the instant case, Bazile bases his hostile work environment claim on both his modified duty assignment in the Brooklyn Court Section and his current walking post assignment. To establish a claim for exposure to a hostile work environment under Title VII, a plaintiff must present sufficient evidence that he was subjected to discriminatory behavior sufficiently severe or pervasive to create a hostile or abusive working environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The environment must be both objectively hostile or abusive in the eyes of a reasonable person and subjectively hostile in the eyes of the victim. *See id.* (quoting *Meritor Sav. Bank*, 477 U.S. at 64, 67, 106 S.Ct. 2399).

Where alleged discriminatory conduct occurs prior to the filing of a charge with the EEOC, before commencing a Title VII suit the plaintiff must first exhaust his administrative remedies by presenting his claim to the EEOC within 300 days of the asserted violation. *See* 42 U.S.C. § 2000e–5; *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Legnani v. Alitalia*, 274 F.3d 683, 686 (2d Cir.2001) (citations omitted).

 When a claim relates to conduct that arises subsequent to an EEOC filing, the Court may consider it only if it is "reasonably related" to the matters asserted in the EEOC charge. *See Legnani*, 274 F.3d at 686; *Butts v. City of New York Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993); *see also Hall v. City of New York*, No. 00 Civ. 8967, 2002 WL 472057, at *2 (S.D.N.Y. Mar. 27, 2002). In determining whether a claim stated in a

judicial action is reasonably related to that alleged in an EEOC proceeding, courts "look not merely to the four corners of the often inarticulately framed charge, but also take into account the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Gomes v. Avco*, 964 F.2d 1330, 1334 (2d Cir.1992) (quoting *Silver v. Mohasco*, 602 F.2d 1083, 1090 (2d Cir. 1979)). The "reasonably related" doctrine does not cover a failure to include in the EEOC charge allegations of acts of discrimination which the plaintiff must have been aware of, and which arose prior to the filing of the administrative complaint. *See Hall*, 2002 WL 472057, at *4.

The Magistrate Judge extensively discussed the record with regard to this claim and recommended that Bazile's hostile environment claim be dismissed because Bazile failed to show that the conditions in both the Brooklyn Court Section and his current assignment rose to the level of a hostile work environment, and also because of Bazile's failure to comply with administrative exhaustion requirements. (*See* Report at 56.) The Magistrate found that Bazile failed to offer any "evidence that even begins to focus on satisfying the applicable, and quite rigorous standards" to sustain a hostile work environment claim. (*Id.* at 62.) Furthermore, the Magistrate also found that Bazile failed to make any reference to his working conditions in either location in his EEOC complaint, other than that he was not on regular duty. (*See id.* at 57.) On the basis of its *de novo* review of the record in light of Bazile's objections, the Court concludes that Bazile's hostile work environment claim fails for the reasons set forth in the factual and legal analysis of the Report.

objections to the proposed findings and recommendations.") (emphasis added).

### 1. *The Brooklyn Court Section*

██ Bazile alleges that the hostile work environment he was subjected to in the Brooklyn Court Section was longstanding. (*See* Pl.'s Rule 56.1 Statement, dated Aug. 25, 2000, at ¶ 17.) Therefore, Defendants' alleged misconduct, of which Bazile was aware, includes actions which must have occurred prior to the filing of his January 20, 1998 EEOC complaint. (*See* Pl.'s Compl. at 15.) However, the EEOC complaint did not contain any claim of a hostile work environment. Bazile was moved to his current assignment on February 10, 1999 (*see* Pl.'s Rule 56.1 Statement at ¶ 1.) Bazile thus failed to file a hostile work environment claim with the EEOC within 300 days of the alleged violation as required under 42 U.S.C. § 2000e–5(e)(1), and is procedurally barred from asserting such a claim in this Court. *See Legnani v. Alitalia,* 274 F.3d at 686.

Moreover, Bazile's EEOC charge asserted in precise and extensive detail matters relating to the extended modified duty and delays in the NYPD investigation. There is nothing in Bazile's allegations related to his assignment to the Brooklyn Court Section suggesting a pervasive, abusive environment upon which a rational trier of fact could find that he was subjected to a hostile work environment due to his race or national origin.

### 2. *The Current Walking Post*

██ On February 10, 1999, Bazile was transferred from the Brooklyn Court Section to his current walking post assignment. (*See* Pl.'s Rule 56.1 Statement at ¶ 1.) In the instant case, Bazile alleges that he is exposed to a hostile work environment in his current walking post, in addition to the hostile work environment that he was exposed to in the Brooklyn Court Section. Because Bazile was assigned to his current walking post after he filed his January 20, 1998 EEOC charge, he must demonstrate that this claim is reasonably related to the allegations that he asserted in the EEOC charge. *See Legnani,* 274 F.3d at 686; *Butts,* 990 F.2d at 1401. Claims are reasonably related to allegations asserted in an EEOC charge when such claims fall within the scope of the EEOC investigation and can reasonably be expected to grow out of the charge. *See Butts,* 990 F.2d at 1401–03.

Based on the information Bazile presented, it is highly unlikely that the EEOC would have investigated a hostile work environment claim. Bazile's complaint to the EEOC concerned only his lengthy modified duty assignment in the Brooklyn Court Section. He failed to suggest the existence of a hostile work environment anywhere in his EEOC charge. Because Bazile's current assignment is with an entirely different unit, and he did not mention a hostile work environment anywhere in his EEOC charge, the Court concludes that it is unlikely that the EEOC would have investigated such a charge on the basis of Bazile's EEOC filing, and that this claim is not reasonably related to any allegations in his EEOC charge. *See Hall,* 2002 WL 472057, at *4. Accordingly, he is procedurally barred from pursuing such a claim with this Court. *See Legnani,* 274 F.3d at 686.

██ Furthermore, even if Bazile had exhausted his administrative remedies, his hostile work environment claim would still fail. Bazile did not establish that his work environment was sufficiently severe and hostile to satisfy the requirements of a hostile work environment claim. His only evidence supporting this claim is that the Brooklyn Court Section assignment was viewed as undesirable, and that at his current job he is teased by his fellow officers regarding the pitt bull. (Pl.'s Rule 56 Statement at ¶ 23.) These allegations are insufficient to satisfy the severe or perva-

sive standards of an objectively hostile or abusive work environment. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367; *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. 2399; *see also Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 436 (2d Cir.1999).

Bazile asserts that because he initially proceeded *pro se,* the Court should liberally construe his complaint, and therefore the administrative exhaustion requirement for his claims should be waived. (*See* Pl.'s Objections at 14–15.) However, while "district courts should 'read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments they suggest,'" proceeding *pro se* "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Sank v. City Univ. of New York,* No. 94 Civ. 0253, 2002 WL 548744, at *6 (S.D.N.Y. Apr. 12, 2002) (citations omitted). For the foregoing reasons, the Court finds that Bazile failed to comply with the "procedural and substantive law" related to his hostile work environment claim. *Id.* As a result, his former status as a *pro se* plaintiff is immaterial.

## B. *RETALIATION*

In order to support a claim of retaliation under Title VII, Bazile must establish that: (1) he engaged in protected activity; (2) his employer was aware of such participation; (3) an adverse employment action followed; and (4) a causal connection between the protected activity and the adverse employment action existed. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000) (quoting *Cosgrove v. Sears,* 9 F.3d 1033, 1039 (2d Cir.1993)). Additionally, as discussed above, Bazile must exhaust his administrative remedies for claims arising prior to the filing of his EEOC complaint before making a retaliation claim in federal court. *See Legnani,* 274 F.3d at 686.

The Report concluded that Bazile's retaliation claim fails because Bazile failed to establish the requisite *prima facie* case. (*See* Report at 46–52.) More specifically, Bazile failed to establish that he had engaged in activity protected by Title VII. The article in the *Daily News* only described Bazile's long wait for formal charges to be filed, and made no mention of the alleged discrimination. (*See id.* at 42, 46.) Furthermore, the Report finds that Bazile offered no evidence that he made any complaints of discrimination to the reporter. (*See id.*) Bazile also offered no evidence that the Defendants knew of his participation in his alleged protected activity. (*See id.*) Finally, the Report found that Bazile did not establish a genuine issue of material fact as to whether the referral for a psychological evaluation was an adverse employment action. (*See id.* at 47–49.) On the basis of its *de novo* review of the record in light of Bazile's objections, the Court, essentially for the reasons set forth in the Report, rejects Bazile's objections.

### 1. *Exhaustion*

Bazile makes numerous claims of retaliation, some of which are barred due to his failure to exhaust his administrative remedies. Bazile's claim that his Brooklyn Court Section assignment was retaliatory is barred because it arose prior to his EEOC charge, and Bazile did not comply with the requirements of administrative exhaustion by pursuing this claim with the EEOC. *See Legnani,* 274 F.3d at 686. As Bazile is no longer assigned to this post, and 300 days have passed since he was transferred, he is procedurally barred from asserting this claim in this Court. *See Zipes,* 455 U.S. at 393, 102 S.Ct. 1127. In contrast, because Bazile's EEOC charge contained allegations that the purpose of the NYPD psychological evaluation was to retaliate against him,

this claim is not procedurally barred. Bazile asserts numerous other claims related to the NYPD's alleged retaliation, specifically including through: the filing of disciplinary charges; his conviction; the sanctions imposed; the denial of overtime; the refusal to approve off-duty employment; the failure to grant an integrity hearing; the suggestion of criminal charges; the denial of an OATH hearing;[3] and his current walking post assignment. These claims are not barred by Bazile's failure to exhaust administrative remedies, as they all relate to NYPD actions taken after and within the scope of his EEOC charge. Thus, these claims would likely have been investigated by the EEOC and are reasonably related to the EEOC charge. *See Butts*, 990 F.2d at 1401; *Legnani*, 274 F.3d at 686.

### 2. *Merits*

■ Bazile claims that the NYPD retaliated against him through the above actions because he discussed his case with a reporter from the *Daily News*, filed complaints with internal affairs, and requested help from public officials. (*See* Pl.'s Objections at 4.) To establish a prima facie case for retaliation under Title VII, Bazile must demonstrate that he engaged in some form of protected activity. *See Gordon*, 232 F.3d at 116. Protected activities include complaining about unlawful practices under Title VII, *see* 42 U.S.C. § 2000e–2(a)(1), as well as testifying, assisting, or participating in an investigation, proceeding, or hearing pursuant to Title VII. *See* 42 U.S.C. § 2000e–3(a). Bazile's communications with a reporter from the *Daily News* were not protected under Title VII. There is nothing in the resulting article that mentions discrimination based on race or national origin. (*See Daily News.*) The

focus of the story is the long delay in the NYPD disciplinary proceedings relating to Bazile's conduct. Nor does Bazile himself allege that he spoke of discrimination based on race or national origin to the reporter. Therefore, his communication with the *Daily News* is not a protected activity under Title VII.

■ Only one of Bazile's communications with NYPD internal affairs and other public officials mentions a discriminatory motive behind the NYPD's actions. (*See* Letter from Bazile to Commanding Officer of the Brooklyn Court Section, dated June 28, 1998, attached as Ex. M to the Glass Decl., at 2.) To the extent that Bazile's complaints filed with NYPD internal affairs and communication with various public officials are protected, he has failed to demonstrate a causal connection between the protected activity and the alleged adverse employment actions. *See Gordon*, 232 F.3d at 116; Am. Compl. at ¶ 19–29; Pl.'s Objections at 3–6. Furthermore, the NYPD has offered a neutral, non-discriminatory explanation for its actions that is both plausible and reasonable. Bazile, working as an off-duty security guard, fired eleven shots in the lobby of an apartment building at a small, twenty-pound pit bull that was approaching without growling or barking. (*See* Def.'s Rule 56.1 Statement at 2–3.) While several of the bullets hit his intended target, others struck Bazile's own face and the bicycle tire of the boy entering the lobby. *See id.* Such actions demonstrated a plausible reason other than animus based on race or national origin for the NYPD's decisions to investigate and ultimately discipline Bazile. *See, e.g., Richardson v. New York State Dep't of Corr. Service*, 180 F.3d 426, 443 (2d Cir.1999). Bazile presents no evidence

---

**3.** The Office of Administrative Trials and Hearings is an office independent of the NYPD to which officers may bring complaints

if they feel that a neutral trial cannot be held internally.

that the NYPD explanation was a pretext to conceal an unlawful discriminatory purpose.[4]

### C. SECTION 1983 CLAIMS

Under 42 U.S.C. § 1983, a plaintiff may recover on an equal protection claim if he is treated differently from other similarly situated employees due to his race or national origin. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998). To prove such a claim, a plaintiff must establish that: (1) he was involved in a protected activity; (2) an adverse action was taken against him under color of state law; and (3) a causal connection exists between the two. *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Where the plaintiff is a government employee, however, he must also demonstrate that the protected activity in which he was engaged related to a matter of general public interest as opposed to a personal grievance. *See Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

The Magistrate Judge reviewed Bazile's § 1983 claims and recommended that they be dismissed because Bazile failed to establish the *prima facie* case. (*See* Report at 45, 52–55.) The Court agrees, essentially for the reasons set forth in the Report. As a government employee, Bazile's speech was not a form of protected activity unless it pertained to a matter of public interest. *See Waters*, 511 U.S. at 668, 114 S.Ct. 1878. The article in the *Daily News* referred only to Bazile's own complaints regarding his particular employment dispute, and his dissatisfaction with his assignment; it did not report any statements by Bazile concern-

ing a matter of general public interest. Bazile's speech, therefore, did not qualify as protected activity for the purposes of § 1983. (*See* Report at 53.) Moreover, even if Bazile's claims did present a matter of public interest, they did not include any complaints of employment actions sufficiently adverse to set out a claim under § 1983. Accordingly, the Court rejects Bazile's objections and grants judgment dismissing his § 1983 claim.

### D. EXPERT TESTIMONY

Finally, Bazile objects to the exclusion of Levine's expert testimony about the internal disciplinary procedures of the NYPD and the discriminatory nature of the NYPD's actions in Bazile's case. (*See* Pl.'s Objections at 6.) Bazile asserts that the Magistrate Judge improperly applied the factors of the test delineated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), when he determined that Levine's testimony was inadmissible. (*See* Pl.'s Objections at 7.) Under *Daubert*, a court may consider a number of factors before it admits expert opinion testimony. Such factors include whether: (1) the theory on which the expert relies has been tested; (2) the theory has been subject to peer review or publication; (3) the actual or potential rate of error of the theory when applied is known; (4) standards exist and are maintained to govern the theory's operation; and (5) the theory has been generally accepted by the expert community. *See id.* at 593–94, 113 S.Ct. 2786.

While *Daubert* dealt specifically with scientific expert testimony and declined to address technical or other specialized knowledge, *see id.* at 590 n. 8, 113 S.Ct.

---

4. NYHRL provides protections comparable to Title VII. Bazile's State human rights claims fail for the same reasons that his claims under Title VII fail. *See Leopold v. Baccarat*, 174

F.3d 261, 264 n. 1 (2d Cir.1999). In this regard, the Court agrees with the findings of the Report, and for these reasons rejects Bazile's State claims. (*See* Report at 65–66.)

2786, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that *Daubert's* general holding "setting forth the trial judge's general 'gatekeeping' obligation applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.'" *Id.* at 144, 119 S.Ct. 1167. Furthermore, the factors set forth in *Daubert* do not constitute a "definitive checklist or test," *id.* at 150, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786), and this "gatekeeping inquiry must be tied to the facts of a particular case," *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (quoting *U.S. v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) (internal quotations omitted)).

In deciding if particular testimony is reliable, "the nature of the issue, the expert's particular expertise, and the subject of his testimony" must be considered. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. First, the court must determine whether the testimony rests on a reliable foundation, or whether the expert's testimony is "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Second, the testimony must be relevant in that it "fits" the facts of the case. *Id.* at 591–92, 113 S.Ct. 2786. Finally, it must "assist the trier of fact to understand the evidence or determine a fact in issue." *Id.* at 580, 113 S.Ct. 2786; Fed.R.Evid. 702.

The Magistrate Judge analyzed Bazile's claims regarding the admissibility of Levine's testimony and concluded that it was inadmissible because Levine lacked the necessary qualifications to comment on the methods used by the NYPD to investigate a firearm discharge and to assess the existence of a discriminatory animus behind their actions. (*See* Report at 39–40.) The Magistrate Judge found that Levine was simply offering his own opinion regarding the relative credibility of the testimony by Bazile and the NYPD officers. (*See id.* at 40.) Having reviewed the matter *de novo*, the Court concludes that, for the reasons set forth in the Report's findings, Levine's testimony is not admissible under the standards articulated by *Daubert* and *Kumho Tire*.

In the instant case, Bazile seeks to introduce Levine's testimony to establish that the NYPD's actions were motivated by a discriminatory animus. On the basis of its review of Levine's qualifications, the Court finds that Levine lacks the necessary experience and qualifications to testify on this matter. (*See* Resume of Levine, Pl.'s Ex. 1–A.) Although he does have experience in drug enforcement and in supervision of law enforcement personnel, he has none in conducting internal disciplinary investigations, such as the one involved in the instant case which took place in a large public agency like the NYPD. (*See id.*) He also has no particular expertise that would qualify to assess whether a discriminatory animus motivated the NYPD in this case. (*See id.*) Therefore, his testimony is not only based on subjective belief, but also does not fit the facts of the case. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Levine's testimony does not rely upon any theory related to discriminatory motivations, nor are there any standards which control the operation of his opinions. *See Id.* at 591–92, 113 S.Ct. 2786. The Court finds that his conclusions will be of little value to the finder of fact. The average jury can assess whether or not the NYPD acted with a discriminatory animus without the assistance of Levine's testimony. *See* Fed.R.Evid. 702; *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

### III. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the June 27, 2002 granting Defendants' summary judgment in this action is amended to incorporate the discussion set forth above, and it is finally

**ORDERED** that the Defendants' motion for summary judgment is GRANTED.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

### REPORT & RECOMMENDATION

TO THE HONORABLE VICTOR MARRERO, District Judge.

DOLINGER, United States Magistrate Judge.

Plaintiff Pierre Bazile is an officer in the New York City Police Department. He filed this lawsuit to challenge disciplinary actions taken against him by the Department for his alleged misconduct in shooting a dog in the lobby of a residential building. Plaintiff asserts principally that the Department placed him on modified assignment and then disciplined him because of his race and national origin and because he has spoken out against Department practices that purportedly discriminate against minority officers. He further claims that the disciplinary proceeding denied him due process and equal protection. Finally, he presses claims pertaining to other actions allegedly taken against him by the Department. Thus, he alleges that, while on modified assignment, he was subjected to a hostile work environment, presumably on the basis of race, and that he

was defamed by a Department personnel order that recited his disciplinary conviction and sanctioning. Bazile seeks compensatory and punitive damages, as well as other relief, against the City, the Department and four supervisory Department officials.

Following the completion of discovery, defendants have moved for summary judgment. For the reasons that follow, we recommend that the motion be granted.

*Plaintiff's Claims*

We summarize plaintiff's allegations and claims on the basis of his amended complaint, which was authored by his attorney.[1] Although that pleading lists ten separate claims, ultimately they appear to reduce to four separate theories, which are asserted variously against the City, the Department, and the four defendant officials, who are sued in both their personal and their official capacities.[2]

First, plaintiff contends that he was subjected to an extended period of modified assignment and a baseless disciplinary proceeding, and that he was unjustly convicted and punished, because of his race or national origin. (Am. Compl. at ¶¶ 22 [3]–40, 59, 63, 70; Pltff's Memo at 1–2). Thus, he asserts discrimination claims under 42 U.S.C. §§ 1983 & 1985 and under the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* and the provisions of New York City Local Law 59, as amended. (Am. Compl. at ¶¶ 47, 50, 55, 59, 63, 68–69, 74). He appears as well to assert a claim under Title VII against the defendants for

---

**1.** Plaintiff filed his original complaint while proceeding *pro se.*

**2.** We note that the pleading contains a broad array of conclusory allegations—many seemingly from a boilerplate set of forms—that do not appear to relate to the facts of this case. For example, plaintiff includes an allegation of constructive discharge (Am. Compl. at ¶ 63), even though he continues to work for

the Department. In summarizing plaintiff's contentions we have exerted some editorial control in order to present a coherent list of claims that are at least arguably related to the facts of this case.

**3.** The paragraphs of the complaint in this section run as follows: 22, 23, 24, 25, 22, 26. This citation refers to the second paragraph 22.

disparate treatment, as reflected in his EEO charge, although the complaint does not specifically cite that statute in connection with his disparate-treatment allegations.[4]

Second, plaintiff contends that he was the victim of retaliation by the Department for complaining about discriminatory Department policies and practices. Although the complaint is quite vague as to the details of this claim (*see id.* at ¶¶ 59, 68, 73, 88–91; Pltff's Memo at 2), from the record it appears that plaintiff's assertedly protected activities included his speaking to a *Daily News* reporter and to various public officials about his treatment while he was on modified assignment both before and after departmental charges were filed against him, his filing a charge with the EEOC and an Article 78 action during the same time period, and his affiliation with a professional organization that has criticized the Department. (Pltff's Rule 56.1 Statement at ¶¶ 1–2, 4–5, 9, 24 and Exs. 7, 15, 16, 21). The alleged retaliation by the Department, as described in the complaint and subsequent papers, included his referral for psychological evaluation and, apparently, the decision by the Police Commissioner to find him guilty of two misconduct charges, which led to the imposition of a one-year probation period and the loss of twenty vacation days. (Am. Compl. at ¶¶ 89–91; Pltff's Rule 56.1 Statement at ¶¶ 6, 9–11 and Ex. 1(S)). Based on these contentions, he asserts retaliation claims under Title VII and state and local law, and apparently seeks to press a comparable claim under section 1983 for First Amendment retaliation. (Am. Compl. at ¶¶ 59, 72–74, 88–91).

Third, plaintiff asserts that he was subjected to a hostile work environment. (*Id.*

at ¶¶ 78–80, 82–86).[5] This claim is apparently based on plaintiff's assignment to the Department's Brooklyn Court Section for a period of time while charges either were being considered or were pending against him and his current assignment to a foot-patrol in the 33rd Precinct. (Pltff's Rule 56.1 Statement at ¶ 17–18, 22; Pltff's Memo at 11–12). Based on these allegations, he asserts claims arising under Title VII and state and municipal law.

Fourth, plaintiff invokes a common-law claim that he labels as "defamation". (Am. Compl. at ¶ 94). The asserted basis for this claim is the "publication" of a departmental personnel order reciting the fact of his conviction on disciplinary charges and summarizing the sanctions imposed. (*Id.*). Plaintiff appears to contend that this report was defamatory because the departmental conviction and imposition of sanctions violated a prior order of a State Supreme Court justice, which was affirmed by the Appellate Division. (*Id.* at ¶¶ 33–35, 94).

Plaintiff asserts all of these claims against all of the defendants, both municipal and individual. For relief he seeks back pay with interest, liquidated damages equal to that award, compensatory and punitive damages, attorney's fees, expert-witness fees and costs.

*Defendants' Motion*

In challenging these claims, defendants offer a variety of arguments, which we summarize in a somewhat different order from that adopted by defendants. First, since Title VII does not permit an employee to sue his supervisors, defendants seek dismissal of all Title VII claims against the individual defendants. (Defts' Memo at 20–21). Second, they argue that the Police

---

**4.** Plaintiff invokes Title VII under the headings of "Hostile Environment" and "Retaliation." (*See* Am. Compl. at ¶¶ 79, 91).

**5.** Plaintiff asserts what appear to be two virtually identical claims labelled as "Hostile Environment". (*See* Am. Compl. at Counts 7 & 8).

Department is not a suable entity. (*Id.* at 19).

Third, and more substantively, defendants proffer evidence to demonstrate that the challenged decisions by Department officials to place plaintiff on modified assignment, to proceed with departmental charges, and to convict and sanction him on those charges were not based on plaintiff's race or national origin, but rather on his conduct. Thus, they seek summary judgment on plaintiff's disparate-treatment claims under all legal rubrics. (*Id.* at 6–9, 17).

Fourth, defendants target plaintiff's retaliation claims by arguing that he did not engage in prior protected activities and that there is no evidence that the decision-makers knew of such activities. (*Id.* at 13). Defendants further assert that, in any event, the assertedly adverse actions about which plaintiff complains were not made for retaliatory reasons. (*Id.* at 12–13).

Fifth, defendants seek dismissal of plaintiff's hostile-environment claim on two grounds—that he failed to assert this claim before the EEOC and that he fails, as a matter of law, to demonstrate that he was exposed to such an environment. (*Id.* at 9–11). Sixth, defendants challenge the defamation claim as barred by (1) plaintiff's failure to file an administrative claim with the City, (2) the individual defendants' absolute immunity from liability on such a common-law claim, and (3) the truthfulness of the assertedly defamatory statement. (*Id.* at 17–18, 21).

Seventh, defendants argue that, insofar as plaintiff presses constitutional claims, including denial of due process and equal protection, the claims are subject to dismissal because, as a matter of law, Bazile cannot satisfy the governing legal standards. (*Id.* at 13–14). Alternatively, they say that these claims are barred by collateral estoppel and *res judicata,* as well as

by the *Rooker–Feldman* doctrine. (*Id.* at 14–16). Insofar as plaintiff seeks also to invoke 42 U.S.C. § 1985(3) by alleging a conspiracy to discriminate, defendants say that he fails to allege the elements of a conspiracy. (*Id.* at 16). Finally, they contend that the individual defendants are protected from liability on the constitutional claims by the doctrine of qualified immunity, since they acted reasonably. (*Id.* at 20–21).

Plaintiff has vigorously opposed most, although not all, of the grounds advanced by defendants in support of their motion. In connection with that opposition, plaintiff has proffered a body of materials that is still more voluminous than the record presented by defendants, including a lengthy affidavit by a purported expert on police practices. (Pltff's Ex. 1).

*ANALYSIS*

We address the issues raised by defendants' motion in roughly the same order as we have summarized the grounds for that motion.

### A. *The Title VII Claims Against the Individual Defendants*

In asserting plaintiff's ten articulated claims, the amended complaint does not distinguish among the defendants. Thus, we assume, as do the defendants, that plaintiff is seeking to assert all of his claims against all of the defendants. Necessarily, then, we read the complaint as pressing the Title VII claims against the individual defendants in their individual capacities.

Defendants are correct in arguing that Title VII authorizes suit by an employee only against his employer. *See, e.g., Weeks v. New York State (Div. of Parole),* 273 F.3d 76, 81 n. 1 (2d Cir.2001); *Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir. 2000); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 n. 2 (2d Cir.1995);

*Tomka v. Seiler,* 66 F.3d 1295, 1317 (2d Cir.1995). Thus, the Title VII claims, insofar as asserted against the individual defendants, must be dismissed.[6] *See Wrighten,* 232 F.3d at 120; *Cook,* 69 F.3d at 1241 n. 2.

### B. *The Suit Against the Police Department*

Under the terms of the City Charter, agencies of the City of New York are not suable entities. Rather, the Charter defines the City as the entity to be sued when seeking legal redress for city government misconduct. N.Y. City Charter § 396. Hence, defendants are correct in seeking dismissal of the entire complaint against the Department. *E.g., Ortiz v. Henriquez,* 2001 WL 1029411, at *7 (S.D.N.Y. Sep. 7, 2001); *Wedderburn v. City of New York,* 2000 WL 1877100, at * 1 (S.D.N.Y. Dec. 27, 2000); *Williams v. New York City Police Dep't,* 930 F.Supp. 49, 53–54 (S.D.N.Y.1996); *Bailey v. New York City Police Dep't,* 910 F.Supp. 116, 117 (S.D.N.Y.1996).

### C. *Summary Judgment on the Title VII Disparate–Treatment Claims*

Since defendants seek summary judgment on plaintiff's Title VII disparate-treatment claims, we first summarize the applicable legal standards and then briefly review the pertinent evidentiary record, before we assess this aspect of the motion. For reasons to be noted, we conclude that, as a matter of law, Bazile cannot sustain these claims, and that summary judgment is therefore appropriate.

### 1. *Summary Judgment Standards*

The court may enter summary judgment only if it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68 (2d Cir.2000); *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 485 (2d Cir.1998); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). It is axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). *See, e.g., Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998); *Rule,* 85 F.3d at 1011; *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).

The movant bears the initial burden of informing the court of the basis for his motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002). In making this judgment, the court must view

---

**6.** We note that plaintiff names those defendant supervisors in both their individual and their official capacities. An official-capacity suit against a government official is tantamount to suing the government itself. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Since, as we shall see, a suit against New York City is permissible under Title VII, the Title VII claims, if intended to be asserted against these employees in their official capacities, is duplicative of the claims against the City, and may be dismissed on that basis. *See Walton v. Safir,* 122 F.Supp.2d 466, 477 n. 12 (S.D.N.Y.2000).

the record in the light most favorable to the non-moving party. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hunter v. Bryant,* 502 U.S. 224, 233, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 60–61 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991). If the movant fails to meet his initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Amaker v. Foley,* 274 F.3d 677, 680 (2d Cir.2001); *Arce v. Walker,* 139 F.3d 329, 338 (2d Cir.1998).

If the moving party carries his initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. *See, e.g., Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149 (2d Cir.1998); *LaBounty,* 137 F.3d at 73. In doing so, the opposing party cannot rest on "mere allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P 56(e); *see, e.g., Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), nor can he rely on his pleadings or on merely conclusory factual allegations. *See, e.g., Goenaga,* 51 F.3d at 18. He must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to one or more of the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rule,* 85 F.3d at 1011; *Goenaga,* 51 F.3d at 18.

To demonstrate a "genuine dispute," the opposing party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor. *See, e.g., Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Cinema North Corp. v. Plaza at Latham Assocs.,* 867 F.2d 135, 138 (2d Cir.1989). If, however, "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983) (citing *New York State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.,* 666 F.2d 787, 790 (2d Cir.1981)). *See e.g., Whidbee,* 223 F.3d at 68; *Rogath v. Siebenmann,* 129 F.3d 261, 266–67 (2d Cir. 1997).

### 2. Criteria for Disparate–Treatment Claims

Before applying these standards to the current record, we summarize the legal criteria by which a Title VII claim such as those asserted by plaintiff must be judged. Those standards have been frequently articulated and reflect an oft-described burden-shifting process.

To establish a claim for disparate treatment based on race or national origin, the plaintiff must demonstrate that he was subjected to an adverse employment action, and that his race or national origin was a motivating factor in the action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Weeks,* 273 F.3d at 85. The first step in undertaking such a showing

involves proof of a *prima facie* case. *See, e.g., Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). Plaintiff's burden to establish a *prima facie* case is "minimal". *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (*en banc*). He need only demonstrate that he belongs to a protected class, that he was subjected to adverse action by his employer in connection with his job performance, and that this action took place in circumstances suggesting that it was motivated by race- or national-origin-based animus. *See, e.g., Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 93 (2d Cir. 2001).[7]

If plaintiff makes this showing, defendant is required to proffer evidence that its actions were in fact motivated by a neutral, or non-discriminatory, purpose. *See, e.g., Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). If defendant can articulate such a non-discriminatory reason for its actions, the burden-shifting process is at an end, and the plaintiff is left with the obligation of demonstrating that the proffered neutral explanation is a pretext and that discriminatory animus was in fact a motivating factor in the action. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Weinstock*, 224 F.3d at 42; *Fisher*, 114 F.3d at 1336.

In this case, plaintiff complains of at least two purportedly discriminatory types of actions by defendants. One involves the filing of disciplinary charges and his conviction on those charges. The other concerns his assignment, while the charges pended, to lengthy modified duty in an undesirable job within the Department. The latter complaint is a garden-variety claim of employment discrimination, and is subject to the burden-shifting process that we have described, whereas the other amounts to a claim of selective prosecution or selective enforcement, which is also a violation of the Fourteenth Amendment.

In the context of a claim based on selective prosecution or enforcement, the order of proof may be more compactly summarized. Briefly, the plaintiff must demonstrate (1) that, "compared with others similarly situated, [he] was selectively treated; and (2) [that] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996). *Accord, Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir.2001); *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir.2000).

### 3. *The Pertinent Evidence*

With these criteria in mind, we summarize the pertinent evidence, much of which is not in dispute, although the parties hotly contest what inferences are permissible from the known facts. To the extent that there are conflicts in the competent evidence offered by the parties, we take note of those conflicts.

### (1). *Plaintiff's Initial Departmental Experience*

Plaintiff began his employment as an officer with the New York City Police Department in August 1993. (Bazile Dep. at 24). Prior to the incident that led to the

---

**7.** The elements of a *prima facie* case are stated in occasionally varying ways, but these variations reflect the fact that the criteria are somewhat flexible in nature and will vary to a degree depending upon the circumstances. *See, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, ——, 122 S.Ct. 992, 997–98, 152 L.Ed.2d 1 (2002) (quoting *inter alia Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

current lawsuit, he had one significant performance-related problem.

On August 15, 1995, while still in his probationary period with the Department, Bazile was involved in a vehicular accident while driving a patrol car. He left the scene of that accident and failed to report it to his supervisors. (Bazile Dep. at 29; Request for Formal Charges and Specifications, Ex. L to Defts' Ex. L). As a result, the Department removed his firearm, placed him on modified duty and served him with charges and specifications. (Bazile Dep. at 29; Request for Formal Charges and Specifications, Ex. L to Defts' Ex. L). Bazile subsequently entered a negotiated plea that resulted in a suspension with loss of pay and an extension of his probationary period by six months. (Bazile Dep. at 29).

### (2). *The Shooting Incident and its Aftermath*

Plaintiff ultimately became a full-time officer with the Department and was assigned to the 28th Precinct. (Bazile Dep. at 30). On May 11, 1997 Bazile was off-duty, working as a security guard for Copstat Security. (Bazile Dep. at 43, 49–50; Morris Dep. at 59). That morning he escorted a nurse, Ms. Loreen Bourne, into the public lobby of the Edgemere House apartments, a public housing project in Far Rockaway, Queens. (Bazile Dep. at 50–51; Morris Dep. at 66). While plaintiff and Ms. Bourne waited for an elevator, a dog entered the lobby from the street and approached plaintiff. (GO–15 Tr. at 7, Defts' Ex. B). Apparently feeling threatened, the officer retreated down a hallway off the lobby but also pulled out a nine-millimeter service revolver and discharged eleven shots in the direction of the dog. (*Id.* at 9–14; Morris Dep. at 53; Fries Dep. at 21; Firearms Discharge Assault Report, Pltff's Ex. 18). Three struck the dog and several ricocheted and struck plaintiff in the face. (Complaint Follow-up Form dated May 15, 1997, Pltff's Ex. 1(N); Bazile Dep. at 119–20). One bullet or bullet fragment ended up impaled in the bicycle tire of a teenager near the front entrance of the lobby. (GO–15 Tr. at 17, Defts' Ex. B; Crime Scene Unit Supplementary Report at 3, Pltff's Ex. 6). The dog was later removed to an animal hospital and euthanized there. (Bazile Dep. at 119; Morris Dep. at 45; May 15 Complaint Follow-up, Pltff's Ex. 1(N)).

Because plaintiff had discharged his revolver, the Patrol Guide required an immediate follow-up departmental investigation. (Patrol Guide 116–20, Ex. G to Defts' Ex. L). That investigation was assigned to then-duty captain, and now defendant, William Morris and to Deputy Inspector Charles Doonan. (Morris Dep. at 6–7, 14; Bazile Dep. at 107). According to Captain Morris, at the outset of the investigation, Queens Assistant District Attorney Phyllis Weiss requested that the Department refrain from interviewing plaintiff at that time because the Queens County District Attorney's Office intended to investigate the incident. (Morris Dep. at 32).

Captain Morris spoke to the owners of the dog, who, not surprisingly, expressed concern about the shooting of their dog inside the building lobby. (Morris Dep. at 21–23, 26). Following that interview and an on-site inspection, Morris promptly prepared the required report about the incident and issued it the same day as the shooting. (Initial Firearms Discharge Report, Ex. N to Defts' Ex. L). In the report, which he apparently discussed with Inspector Doonan, who discussed it with Chief Tuller (Morris Dep. at 30–32), he made no recommendation as to whether plaintiff should be disciplined, an omission that he attributed to the pendency of the District Attorney's investigation. (*See* Initial Firearms Discharge Report, Ex. N to Defts' Ex. L; Morris Dep at 29, 32, 39). Nonetheless, Morris believed that plaintiff

may have endangered innocent lives by his conduct, a conclusion that Morris based on the number of rounds fired, the small size of the dog (estimated at twenty pounds) (July 27 Admin. Trial Tr. at 33–34, Defts' Ex. O; *see also id.* at 58),[8] the confined space of the lobby and the fact that one of the bullets had struck a boy's bicycle in the front of the lobby. (Morris Dep. at 62–64, 76–77).

Following the issuance of Captain Morris's report, Bazile was placed on modified assignment. (Report of Suspension/Modified Assignment dated May 11, 1997, Defts' Ex. A; Morris Dep. at 28–32; Bazile Dep. at 95). While in that status, plaintiff was assigned to perform administrative tasks in the Brooklyn Court Section of the Department. (Bazile Dep. at 35–36; NYPD Position Statement at 5, Defts' Ex. L). During the period of his modified duty, he continued to receive the same compensation as on regular assignment. (Bazile Dep. at 39–41).

In addition to the initial firearms discharge report, Captain Morris prepared a second report, pursuant to Patrol Guide 118–12, which he transmitted to the First Deputy Commissioner. (Morris Dep. at 33–34; Report from Duty Captain to First Deputy Commissioner, Ex. O to Defts' Ex. L;). In that report, he recounted the shooting incident in some detail and advised that Bazile had been placed on modified assignment pending further investigation and that he had not yet been interviewed because of a request from the Queens District Attorney. (Morris Dep. at 33–34; Report from Duty Captain to First Deputy Commissioner, Ex. O to Defts' Ex. L, at ¶¶ 12–13).

On August 18, 1997, as required by Patrol Guide 118–09, plaintiff underwent a so-called GO–15 interview about the incident. (Patrol Guide 118–09, Ex. F to Defts' Ex. L; GO–15 Tr., Defts' Ex. B).[9] The interview was conducted by three officials from the 101st Precinct and Patrol Borough Queens South—defendants Captain Jeffrey Behrens, Captain Charles Fries and Captain Steven Donnelley. (GO–15 Tr. at 2, Pltff's Ex. 1(H); Donnelley Dep. at 6; Behrens Dep. at 17; Fries Dep. at 9).

Two weeks after the GO–15 interview, on September 3, 1997 Captain Behrens submitted a Final Firearms Discharge Report to the Chief of Department. (Final Firearms Discharge Report dated Sept. 3, 1997, Ex. P to Defts' Ex. L; Behrens Dep. at 10; Fries Dep. at 22). This report, which was authored by Behrens and concurred in by Captain Fries, concluded that Bazile had violated two paragraphs of section 104–01 of the Patrol Guide. These provide that "Police Officers shall not dis-

---

8. At the disciplinary hearing, plaintiff contested this weight estimate and offered a guess that the dog weighed thirty-five pounds. (Aug. 10 Admin. Trial Tr. at 93, Defts' Ex. O).

9. Plaintiff complains that this interview took place more than ninety days after the shooting incident, purportedly in violation of Department regulations. Defendants explain that the delay was initially attributable to the request by Assistant District Attorney Weiss that the Department postpone the GO–15 interview of plaintiff (N.Y.PD Position Statement at 2, 5, Defts' Ex. L; *see also* Ex. O to Defts' Ex. L, at ¶ 12), a representation that is uncontradicted on the record, although we note that the District Attorney's inquiry apparently ended by May 20. (Complaint Follow-up Form dated May 20, 1997, Pltff's Ex. 1(N)). In any event, plaintiff offers no evidence that the length of time before the GO–15 interview was attributable to discriminatory animus.

Plaintiff questions whether the District Attorney ever opened a criminal investigation, but he offers no evidence to dispute Captain Morris's testimony that Assistant District Attorney Weiss advised the Department that an investigation was being undertaken and requested that Morris refrain for a while from interviewing plaintiff.

charge their weapons when doing so will unnecessarily endanger innocent persons" and that "Police Officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat." (Patrol Guide 104–01(b) & (h), Ex. I to Defts' Ex. L; Final Firearms Discharge Report at ¶ 14, Ex. P to Defts' Ex. L).

The Patrol Borough Queens South Firearms Discharge Review Board is responsible for reviewing all officer shooting incidents in Queens. (Ziegler Dep. at 16). On September 30, 1997, the Board reviewed the incident involving Officer Bazile. (Ziegler Dep. at 10–11; Memo from Chief Douglas Ziegler, Ex. Q to Defts' Ex. L). The five-member Board concluded that plaintiff had violated Department guidelines, and it recommended to the Chief of the Department Firearms Discharge Review Board that Bazile be served with charges and specifications as well as given additional firearms instructions. (Ziegler Memo, Ex. Q to Defts' Ex. L). On December 2, 1997, the Chief of the Department concurred with this recommendation, and on or about March 31, 1998, the Department Advocate's Office approved the issuance of the two specific charges. (Findings of Dept. Firearms Discharge Review Board, Defts' Ex. C; Pltff's Ex. 1(G)).[10]

In late December 1997—prior to the formal filing of charges—Deputy Chief Douglas Ziegler, the Chairman of the South Queens Firearms Board, asked that plaintiff be evaluated by the Department's Psychological Services. (Ziegler Dep. at 19, 21–22, 49–50; Telephone Referral Report dated Dec. 22, 1997, Defts' Ex. E; Bazile Dep. at 96, 97–98, 112). According to Chief Ziegler, his request was based on the fact that Bazile had "discharg[ed] a firearm eleven times in a public lobby with people around." (Ziegler Dep. at 49–50). Based on this directive, defendant Lieutenant Thomas Barry, an Integrity Control Officer in the Department's Brooklyn Court Section and plaintiff's ultimate supervisor, arranged for that referral. (Barry Dep. at 5, 11–12, 17; Tel. Referral Report, Defts' Ex. E; Bazile Dep. at 96, 98, 112, 138). There is no indication in the record that this referral, or any conclusions reached as a result of the evaluation, affected plaintiff's job assignment or status in the Department.

In the wake of the filing of charges and specifications against Bazile in March 1998 (Charges & Specifications, Defts' Ex. K), he pled not guilty, and received a departmental administrative trial. The trial was held on July 27 and August 10, 1998, and was conducted by the Department's Deputy Commissioner of Trials Rae Downs Koshetz. (Admin Trial Tr., Defts' Ex. O). During that proceeding, Bazile was represented by counsel and was permitted to testify and call witnesses, to offer exhibits and to cross-examine Department Advocate witnesses. (*Id.;* Bazile Dep. at 92–93).

The witnesses included an investigating police sergeant, who reported, among other things, that one of the bullets that Bazile had fired in the lobby of the building had struck a teenager's bicycle at the front of the lobby as the boy was bringing the bike into the building. (July 27 Admin. Trial Tr. 29, 36, Defts' Ex. O).[11] The

---

**10.** Defendants do not explain why the charges were not filed for nearly four months after the decision was made to press charges. Plaintiff, however, offers no evidence that this length of time was unusual, much less that it reflected discriminatory animus.

**11.** The transcripts of the July 27 and August 10 administrative trial sessions are separately paginated, although both are included as part of defendants' exhibit O. We therefore cite them separately by their dates.

sergeant also testified to his understanding that the dog was a mixed breed, although apparently part Pit Bull, and that it weighed about twenty pounds. (*Id.* at 33, 35).

Loreen Bourne also testified and recalled that she had seen the dog enter the lobby, dragging his chain, but that she had not heard him bark or snarl. (*Id.* at 57) According to Ms. Bourne, she did not see Bazile from the time she saw the dog until when the shooting stopped, at which time he said "let's get out of here" and then ran out of the building with her to her car. (*Id.* at 57, 58). She also testified that she had not been afraid of the dog, but that she had been "panicked" by the shooting. (*Id.*).

Bazile testified that when he saw the Pit Bull coming at him in the lobby, he had said "something to the effect of 'oh no, it's a Pit Bull'" to Ms. Bourne. (Aug. 10 Admin. Trial Tr. 17). He conceded that the dog had not barked or snarled at him and had not bitten him. (*Id.* at 52–53). Nonetheless, he reported feeling trapped and threatened because the dog had entered the lobby rapidly and approached him rapidly, while "baring" its teeth, and he explained his use of his firearm on that basis. (*Id.* at 19, 20, 58–59). He stated that he had been told that he had fired eleven shots. (*Id.* at 38). He also offered the hearing officer a book about Pit Bulls, which she received in evidence, although she noted that the book advised that such dogs can make good pets. (*Id.* at 69, 71). Finally, he referred to other incidents involving police officers who had been menaced or bitten by Pit Bulls. (*Id.* at 66–67).

Following the conclusion of the hearing, Deputy Commissioner Koshetz issued a report and recommendation on December 22, 1998 addressed to Police Commissioner Howard Safir. (Defts' Ex. T). In that decision, she found plaintiff guilty of both charges that he faced. (*Id.* at 8, 10). As

for a proposed penalty, she noted that this was plaintiff's second misconduct conviction in three years, and she therefore recommended (1) dismissal probation of one year and (2) loss of twenty vacation days. (*Id.* at 11–12).

In support of her recommended conclusion, she first accurately summarized the hearing testimony (*id.* at 2–8), and then evaluated the reasonableness of Bazile's actions in view of the circumstances that he had confronted. (*Id.* at 9–10). Relying on Ms. Bourne's testimony that she had not heard the dog bark or growl and that she had not been frightened by it, as well as Bazile's concession of essentially the same facts, she found his reaction unjustified. In doing so she observed that, even construing Bazile's testimony in the most favorable light, the dog had done nothing but run toward him. Thus, she wrote, "In order to find the dog's conduct to be grounds for shooting him, I would have to conclude that any animal that looks like a Pit Bull is inherently dangerous. There is insufficient evidence on the record to draw that conclusion." (*Id.* at 9).

She went on to note that adult Pit Bulls, "particularly those handled by some street toughs in New York City", may look "threatening" and that an officer facing such a dog in threatening circumstances need not wait to be injured before acting. "I would not fault the Respondent if he took preemptive action against a dog which, using a reasonable person standard for evaluation, appeared to be ready to maul his flesh." (*Id.* at 9). She found, however, that Bazile appeared to have overreacted, and noted particularly his expression of fear as soon as he saw the dog. As she concluded:

I do not believe than an officer has to be bitten before he can act. At the same time, the officer must evaluate all of the circumstances in order to act properly.

In this case, 11 rounds were fired in the lobby of an apartment building, toward the entrance and past an elevator, where the Respondent knew that at least one person was standing. The fact that [the] ... bicycle tire was flattened is testimony to the danger created by this discharge.... In sum, I believe that the Respondent, who described bad experiences with Pit Bulls that he had witnessed or been a party to in the past, overreacted out of fear that interfered with his exercise of sound judgment in this situation.

(*Id.* at 10).

On January 15, 1999, Commissioner Safir adopted the findings of Deputy Commissioner Koshetz and approved her recommended penalty. (Disposition of Charges, Defts' Ex. U; Personnel Order 113 at 4, Defts' Ex. Y). Plaintiff lost no portion of his salary from the Police Department as a result of his experience with this disciplinary proceeding, and later returned to full duty at the 28th Precinct. (Bazile Dep. at 36–37, 39–41).

### (3). *Plaintiff's Efforts to Challenge the Disciplinary Proceeding*

During the course of the Department's consideration of whether to file disciplinary charges and its prosecution of those charges against plaintiff, Bazile pursued an aggressive strategy to challenge this process. We summarize his principal efforts in chronological order.

### (a). *The Newspaper Contact*

In December 1997, after the Department's Firearms Discharge Review Board had recommended the filing of charges and specifications and the Chief had concurred, Bazile contacted a reporter for the *Daily News* to complain about the process. (Ba-

zile Dep. at 66–68). This contact led to an article about the case in the December 21, 1997 issue of the newspaper. The article mentioned the amount of time that Bazile had been on modified duty, but contained no allegations—by Bazile or anyone else—that his treatment involved any form of group-based discrimination or retaliatory animus. (*Daily News*, Dec. 21, 1997, Defts' Ex. D).

### (b). *The Borough President's Inquiry*

At about the same time, plaintiff apparently contacted the Queens Borough President, Claire Schulman. (Bazile Dep. at 91, 143). Thus, by letter dated January 14, 1998, she wrote to Commissioner Safir to inquire about the status of plaintiff's disciplinary proceeding. (Letter from Claire Schulman to Comm. Safir, Defts' Ex. F). First Deputy Commissioner Patrick Kelleher responded on behalf of Commissioner Safir, by letter dated February 2, 1998, in which he summarized the process being undertaken by the Department. (Letter from First Deputy Comm. Patrick Kelleher to Borough Pres. Schulman, Defts' Ex. H).[12]

### (c). *Bazile's EEOC Charge*

Plaintiff never filed a complaint of discrimination with the Department's Office of Equal Employment Opportunity. (Bazile Dep. at 68–69). On January 20, 1998, however, he did file a charge with the EEOC in which he complained that the Department had discriminated against him on the basis of race and national origin in its treatment of him in the wake of the shooting incident in May 1997. In particular, he claimed that White officers who had discharged their firearms in equivalent or worse circumstances had not been placed

---

**12.** Plaintiff apparently also contacted his assemblyman, who also wrote a letter of inquiry to the Police Department. (Bazile Dep. at 143–44, 145; February 26, 1998 letter from Ivan C. Lafayette to First Deputy Commissioner Kelleher, Pltff's Ex. 15).

on modified duty or had been returned to regular duty without the prolonged waiting period that he was undergoing. He also complained about his referral to Psychological Services for evaluation, and he suggested that this step had been taken in retaliation for his contact with the *Daily News*. (EEOC Charge, Defts' Ex. G; Bazile Dep. at 69, 71).

During the EEOC investigation, plaintiff identified three Caucasian officers who he believed had fired at dogs and been more leniently dealt with by the Department. (March 10, 1998 letter from EEOC Investigator Orlando Garcia to N.Y. Police Department, Defts' Ex. J). On June 17, 1998, the Department submitted a written response to these allegations, addressing *inter alia* the circumstances of the three identified officers. (N.Y.PD Position Statement, Defts' Ex. L). On November 30, 1998, at the conclusion of the investigation, the EEOC found "no evidence" to support the plaintiff's allegations and issued him a right-to-sue letter. (Letter from EEOC Enforcement Manager Harold F. Wilkes to Pierre Bazile, Defts' Ex. S). At plaintiff's request, the Civil Rights Division of the Department of Justice confirmed his right to sue by letter dated January 26, 1999. (Letter from Karen L. Ferguson to Pierre Bazile, Defts' Ex. V; Bazile Dep. at 183).

(d). *The Article 78 Proceeding*

In early February 1998, still before the Department had filed formal charges and specifications, Bazile filed an Article 78 proceeding in New York State Supreme Court, New York County. By his petition, he sought an order requiring the Department to restore him to regular duty, argu-ing that the Department had violated his rights to due process and equal protection by not acting definitively on the discipline question and keeping him on modified duty. (Art. 78 Petition at ¶¶ 8, 15, Defts' Ex. I; Bazile Dep. at 59, 71–72).

By decision issued on July 31, 1998, the Hon. William A. Wetzel, S.C.J., concluded that the Department could not keep Bazile on modified assignment indefinitely, and he ordered that the Department return him to regular duty by October 23, 1998 unless it had "initiated disciplinary charges prior to that date." (Defts' Ex. P). In a follow-up decision issued on October 7, 1998, Justice Wetzel amended this directive to require that the Department "terminate petitioner's 'modified assignment' and to restore him to full duty no later than October 23, 1998 unless the pending disciplinary proceeding which was concluded on August 10, 1998, has been determined prior to October 23, 1998." (Defts' Ex. R).[13]

As noted, a final decision on the disciplinary charges against Bazile was not issued until January 1999, when Commissioner Safir adopted the recommendations of the hearing officer. Accordingly, in March 1999, Bazile filed another Article 78 petition, in which he sought to challenge the imposition of sanctions on him, purportedly because that step violated Justice Wetzel's October 7 order. (Second Art. 78 Petition, Defts' Ex. X). By decision dated April 27, 1999, Justice Wetzel dismissed that petition because his prior order had not purported to prohibit the Department from taking disciplinary steps against Bazile after October 23, 1998. (Defts' Ex. Z).[14]

---

**13.** This alteration in the court's order was apparently triggered by the court's realization that the Department had in fact "instituted disciplinary charges" long before the July 31 order.

**14.** As noted, the October 7 order required only that Bazile be returned to regular duty if the disciplinary proceeding was not completed by a decision by October 23.

### (e). *Complaints Within the Department*

On June 28, 1998—after charges had been filed but before the hearing—plaintiff filed a union grievance with the Department's Brooklyn Court Section. (Letter Grievance, Defts' Ex. M; Bazile Dep. at 89). He requested that his departmental trial be removed from the Deputy Commissioner of Trials to the Office of Administrative Trials and Hearings. (Letter Grievance, Defts' Ex. M; Bazile Dep. at 87). On July 22, 1998, Police Department Deputy Chief John P. Beirne denied this request on the basis that plaintiff's complaint was not subject to the grievance procedure. (Defts' Ex. N; Bazile Dep. at 90).

Subsequently, by letter dated October 6, 1998, plaintiff complained to the Commanding Officer of the Department's Internal Affairs Bureau about the conduct of various Department officials in connection with his disciplinary proceeding. (Defts' Ex. Q; Bazile Dep. at 94, 100–01). He also sent copies of this letter to various local and state law-enforcement agencies. (Defts' Ex. Q; Bazile Dep. at 101).

### 4. *Assessment of Plaintiff's Disparate–Treatment Claims*

As we understand plaintiff's Title VII disparate-treatment claims,[15] he contends that, but for his race and national origin, he would not have been subjected to an extended period of modified duty, to a formal disciplinary hearing and to the disciplinary sanctions that were ultimately imposed. On the current record, he cannot prevail on these contentions.

There is no dispute that plaintiff is a member of a protected class and that he was subjected to adverse action by his employer, in the form of a disciplinary conviction and imposition of sanctions, as well as by being placed on modified assignment during the pendency of the charges.[16] Plaintiff fails, however, to offer any meaningful evidence that these adverse actions were taken because of his race or national origin. Whether viewed as a failure to carry his *prima facie* burden or his ultimate burden of proof, plaintiff's showing is deficient as a matter of law.

Even if we assume *arguendo* that plaintiff has satisfied his minimal burden to lay out a *prima facie* case, defendants proffer a facially neutral set of reasons for the actions taken by the Department. Plaintiff concededly discharged his service revolver no fewer than eleven times in an enclosed residential lobby solely to ward off a small dog, and he did so despite the proximity of a number of civilians. Moreover, his shooting was so wild that one or more ricocheting bullets struck him and one lodged in the tire of a teenager's bicycle located at the entrance to the building. In the wake of those events, the Department chose to investigate and ultimately to file charges, and provided the usual procedural forum to air the charges, and, based on the findings of the hearing officer and the record created at the hearing over which she presided, the Commissioner chose to sanction plaintiff by placing him

---

**15.** As noted, plaintiff pleads in somewhat opaque terms that he was subjected to disparate treatment, but he does not explicitly label these claims as arising under Title VII, although he does cite section 1983 and state and local law. Nonetheless, since he filed a charge of disparate treatment with the EEOC and does cite the statute at several points in his pleading, we liberally read the complaint to encompass a Title VII claim on this basis.

For reasons that we note below, changing the legal label attached to plaintiff's allegations and evidence will not change the result.

**16.** We assume for purposes of this analysis that plaintiff's reassignment to the Brooklyn Court Section, which represented a significant alteration of his job duties, was at least arguably an adverse employment action within the meaning of Title VII.

on dismissal probation for one year and depriving him of twenty vacation days. As for plaintiff's placement on modified assignment pending the disciplinary proceeding, defendants cite the provision of the Patrol Guide, which authorizes such a step in these circumstances. (N.Y.PD Position Statement at 7, Deft's Ex. L (citing Patrol Guide Procedure 118–12, attached as Ex. C to Depts' Ex. L)). Moreover, they note not only the apparently reckless conduct of plaintiff, but also the fact that this was the second instance of serious and potentially dangerous misconduct in which plaintiff had engaged in less than two years.[17]

As for the length of time it took to resolve the disciplinary proceeding, defendants describe the numerous required procedural steps before disciplinary sanctions may be imposed on an officer. In substance, they argue that the time required was a product of the care with which the incident was investigated and the procedural protections afforded plaintiff in the Department's evaluation of the case.

In the face of these non-discriminatory and facially valid explanations for the Department's decisions, plaintiff fails to demonstrate that the challenged conduct of the Department was attributable to discriminatory animus. Most obviously, Bazile offers no competent evidence that officers of a different race or national origin were consistently treated more favorably in comparable circumstances.

Plaintiff proffers a handful of instances in which officers were involved in shooting incidents with animals. (Bazile Dep. at 82–85; Comparisons of Similar Shooting Incidents in NYPD, Pltff's Exs. 1(O) & 17). He seeks to suggest that this proffer demonstrates that the sanctions against him were not only harsher than warranted, but also were triggered by his race and national origin. The circumstances of the other cases, however, offer no support for plaintiff's assertion of discriminatory animus against him.

First, each of the cases involved a unique set of circumstances, none of which resembled the key facts concerning plaintiff's repeated discharge of his service firearm. In particular, none involved the firing of as many as eleven shots inside a residential lobby with members of the public present.[18] Second, among the cases

---

**17.** Bazile sought to question the *bona fides* of his assignment to modified duty by noting that at one point he had been found "fit for duty". (Bazile Dep. at 107–08; *see also* Initial Firearms Discharge Report at ¶ 23, Ex. N to Defts' Ex. L). The short, and undisputed, answer is that the term "fitness for duty" refers to the officer's physical and mental state at the time, and the cited finding of fitness for duty is not inconsistent with the conclusion that, by virtue of his conduct, he should be placed on modified duty. (N.Y.PD Position Statement at 2, 7, Defts' Ex. L).

**18.** The incidents listed in Pltff's Ex. 17 include the following:

On July 3, 1997, an officer of unspecified race fired three shots on the landing of an apartment building, at a charging Pit Bull-boxer, mixed-breed dog that had been let out by the occupants of an adjacent apartment. There were no other people present. The discharges were found to be within departmental guidelines and no corrective action was recommended.

On October 19, 1996, a detective of unspecified race fired one round at a charging Rottweiler that was within one foot of him and that weighed more than 100 pounds. The discharge was found to be within departmental guidelines, but additional firearms training was recommended.

On October 27, 1995, a police officer of unspecified race fired one round at an uncontrolled Rottweiler who had confronted him in an alleyway. The discharge was found to be within departmental guidelines and no corrective action was recommended.

On October 18, 1995, a detective and a police officer, both described as White, discharged ten rounds between them at two Pit Bulls that were attacking them as they were trying to arrest the dogs' owner. The discharges were found to be within departmental

presented are two in which minority officers—one Black and one Hispanic—had fired at dogs and were not disciplined. (October 30, 1997 Firearms Discharge Report, Pltff's Ex. 1(O) and April 28, 1997 Final Firearms Discharge Report, Pltff's Ex. 17). Third, apart from an absence of anecdotal evidence probative of a pattern of harsher departmental treatment of minorities, plaintiff offers no meaningful universe of comparable cases from which to

derive viable statistical conclusions about the reasons why he was sanctioned.[19]

As for the length of time required to complete the disciplinary process and the plaintiff's assignment to modified duty, Bazile also fails to proffer meaningful evidence that these were attributable to his race or national origin. We have no indication on the current record that disciplinary proceedings involving Black or Haitian-origin officers take longer to complete, or that such officers, when faced with pos-

---

guidelines and no corrective action was recommended.

On December 9, 1997, four police officers of unspecified race fired fifteen shots between them at three attacking Pit Bulls that had previously attacked and seriously injured three civilians. The discharges were found to be within departmental guidelines and no corrective action was recommended.

On November 25, 1997, a detective of unspecified race discharged one round at a Pit Bull that was barking and then charged at him in the back room of a grocery store where the officer was participating in an arrest of the owners of the store. The discharge was found to be within departmental guidelines and no corrective action was recommended.

On September 11, 1997, a police officer of unspecified race fired one round at a mixed-breed, part Pit Bull that was leaping at him on the landing of an apartment building where he had gone to look for a robbery suspect. The discharge was found to be within departmental guidelines, but it was recommended that additional training be provided for the officer.

On November 20, 1997, a police officer of unspecified race fired one round at a lunging mixed-breed dog in the backyard of a house where he was part of a team executing an arrest warrant. The discharge was found to be within departmental guidelines, but training in canine restraint was recommended for the officer.

On January 26, 1998, a White officer discharged one round at one of two large dogs, each weighing sixty to ninety pounds, that were charging him. The dog that was hit was leaping on the officer when he fired. A follow-up investigation was recommended. (The document describing this incident is an

initial firearms discharge report. The others are final reports).

On June 11, 1998, a police officer of unspecified race discharged one round at a Rottweiler that approached him in a threatening manner. The discharge was found to be within departmental guidelines and no corrective action was recommended.
(See Firearms Discharge Reports, Pltff's Ex. 17).

In his deposition, plaintiff described several incidents in which he claims that Caucasian officers shot at dogs and were not disciplined. (Bazile Dep. at 82–85). However, even in his hearsay testimony, he did not provide the details of these incidents. Therefore, we cannot assess them for similarity to his situation.

19. Plaintiff also refers glancingly to the shooting of Amadou Diallo by a number of police officers, and suggests in entirely conclusory fashion that they were treated less severely than he, even though they were responsible for the death of a man. (Bazile Dep. at 81, 86). In the absence of any proffered evidence by plaintiff concerning any commonality in circumstances with his case, this reference has no evidentiary or analytical significance on a summary judgment motion. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir.1997). In any event, from our acquaintance with that case—of necessity through media sources—it appears that the tragic shooting of Mr. Diallo involved entirely different causes and circumstances, and whatever was the approach of the Department to dealing with those officers—who were in fact suspended and criminally prosecuted, see Amy Waldman, The Diallo Shooting: The Overview, N.Y. Times, April 1, 1999 at A1—it bears no relationship to plaintiff's allegations.

sible charges of serious misconduct, are more frequently placed on modified duty. Absent any such evidence, plaintiff's complaint about these aspects of the proceeding cannot be sustained.

In seeking to resist summary judgment on his disparate treatment claims—particularly his attack on the guilty verdict and sanctions—Bazile places principal alternative reliance on the affidavit of Michael Levine, who identifies himself as "a court-qualified expert and legal consultant in criminal matters involving the Use of Deadly Force, Narcotic enforcement (local, federal & international), Informant Handling, Informant entrapment, Undercover Tactics, Investigative Procedures, and other matters related to law enforcement since 1971." (Unsworn "Affidavit" of Michael Levine, executed May 23, 2000, at p. 1). He also describes himself as an expert in dog-handling by law-enforcement agents, and reports that he was a participant in five incidents involving the shooting of a dog, in three of which he "was the actual shooter." (*Id.* at p. 2).[20]

Although Levine's affidavit reviews a substantial volume of information in the record, his proffered testimony involves principally a critique of how the Department handled the investigation of Bazile, culminating in his conclusion that the inquiry was sloppily conducted, with insufficient investigative efforts and poorly focussed questioning of witnesses. (*Id.* at pp. 4, 43). He further opines that the investigative and hearing testimony by plaintiff was credible, that the deposition testimony by some defendants in this case was not, and that the written decision by the hearing officer was poorly reasoned. (*Id.* at pp. 4–21, 38–39). Based on these "findings", Levine offers the further conclusion that the Department was not interested in a dispassionate determination of the truth and that, by inference, defendants were seeking solely to convict Bazile irrespective of the facts, and thus may be presumed to have acted on the basis of discriminatory animus. (*Id.* at pp. 43–45).

Defendants challenge the admissibility of this testimony, and contend that it should be disregarded in assessing plaintiff's opposition to their motion. We agree.

In adjudicating a summary judgment motion, we are limited to the consideration of evidence that is likely to be admissible at trial. *See, e.g., Nora Beverages v. Perrier Group of America,* 164 F.3d 736, 746 (2d Cir.1998). Levine's testimony does not so qualify.

Rule 702 of the Federal Rules of Evidence authorizes testimony by "a witness qualified as an expert by knowledge, skill, experience, training, or education", if the testimony involves "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Thus, expert testimony is admissible only if the witness is qualified and if his testimony is both relevant and reliable. *See, e.g., Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The heart of Levine's analysis involves his critiquing of the departmental investigators' efforts and tactics, and his assessment of the relative credibility of plaintiff and the investigators as witnesses. His testimony in this respect fails on multiple counts.

First, although Levine apparently has long experience in drug enforcement and

**20.** It appears from Levine's curriculum vitae that he served for a number of years in various capacities with the Drug Enforcement Administration. He also worked, more briefly, with the Bureau of Alcohol, Tobacco and Firearms, the Internal Revenue Service, and later with the Barnstable County Sheriff's Department. (*Id.* at Ex. A).

some in supervision of law-enforcement personnel, he has no demonstrated expertise in how to conduct an internal disciplinary inquiry in a large police department, much less any specific knowledge about how the New York City Police Department ordinarily conducts firearms discharge investigations. Thus, he has no basis for comparing how it conducted the Bazile inquiry with how it handles other such investigations.

Second, he has no evident expertise in assessing indicia of discriminatory animus. Since that is the focus of plaintiff's disparate-treatment claims, Levine can offer no reliable evidence as to the central question on the current motion.

Third, to the extent that he criticizes the manner in which various investigators posed questions or otherwise conducted themselves, he is equally speaking without evident expertise, and in any event this testimony is irrelevant to the issues in the case. Whether or not Levine thinks that the investigators did a poor job is inconsequential. He has no documented experience in the art of questioning witnesses in such a proceeding, and in any event—even if he were correct in saying that many of the questions were foolish or nonsensical— this would be of little moment; the issue in this case is not whether the investigation was well or poorly conducted, but whether its outcome was a result of discriminatory animus. Absent a comparison of how investigations of White officers are conducted, Levine's critique of the Bazile investigation is meaningless.

Fourth, to the extent that Levine opines that the questioning by the investigators masked some form of animus towards plaintiff, his testimony is entirely improper. He has no special qualifications for psychoanalyzing the investigators. Moreover, in substance he is simply proffering his opinions about the relative credibility of the testimony of plaintiff and the defendants, a determination that is left for the trier of fact and not for a supposed expert, even one better endowed than Levine with skills relevant to that task. *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988).

In sum, the Levine affidavit adds nothing to plaintiff's showing on his disparate-treatment claims.[21] Since that showing is legally deficient,[22] we recommend the en-

---

21. The only area in which Levine has arguably pertinent expertise is dog-handling. (Levine Aff. at p. 2). The problem with plaintiff's use of him for that purpose, however, is that the issue here is not whether the Department misapprehended the degree of danger that Bazile faced from the dog or the utility of means of suppression other than shooting; it is whether the Department punished plaintiff because of his race or national origin. Levine's experience with dogs does not permit him to do more than opine that the Department's evaluation of plaintiff's conduct was wrong.

22. Plaintiff also cites various examples of what he claims are suspect patterns of conduct by the investigators, which he suggests evidence some nefarious purpose. For example, he cites the length of time they took to conduct his GO–15 interview and to file charges, and the fact that the Firearms Board chairman (Chief Ziegler) did not have a copy of the GO–15 transcript when the Board acted, and the fact that plaintiff was deemed "fit for duty" and yet was placed on modified duty.

None of these facts saves plaintiff's discrimination claims. As noted above, he fails to demonstrate that the amount of time taken was either unusual for this type of case or a failing unique to cases involving Black or Haitian officers. Similarly, he fails to demonstrate that the designation of fitness for duty is inconsistent with a modified duty assignment, much less a mark of racial or national-origin animus. As for the possible non-inclusion of the GO–15 interview transcript in the investigative file in December 1997, there is no suggestion that it was an intentional omission, nor is there anything in the record to suggest that the Board lacked a sufficient

try of summary judgment for defendants on those claims.[23]

### D. Plaintiff's Retaliation Claims

In plaintiff's EEOC charge, he asserted that his referral for psychological evaluation in January 1998 had been undertaken because he had spoken to a journalist, with the result that the *Daily News* had published an article about his long wait for formal charges to be filed. In his complaint in this court, he appears to assert in general terms that he was subjected to retaliation, in violation of Title VII, for complaining about the misconduct of Department officials in connection with their dealings with him and with others. (Am. Compl. at ¶¶ 88–91). He does not, however, clearly identify whether he is seeking to assert not only a Title VII retaliation claim but also one based on the First Amendment. On the assumption that he seeks to press both variants, we address each in turn.

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must demonstrate (1) that he engaged in protected activity defined by Title VII, (2) that the employer knew of his participation in the protected activity, (3) that he was thereafter subjected to an adverse employment action, and (4) that "a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993)).

*Accord, Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000) (quoting *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991)). The statute defines two forms of protected activity; thus, it prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has ... testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

If the plaintiff meets his initial burden, the employer is required to articulate a *bona fide* non-retaliatory reason for the adverse action that it took with respect to the plaintiff. *See, e.g., Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 443 (2d Cir.1999). Upon the proffer of such a neutral reason, the burden returns to the plaintiff to prove that retaliation was a motivating factor in the employer's decision. *See, e.g., Gordon*, 232 F.3d at 117–18 (citing *Fields v. New York State Office of Mental Retardation*, 115 F.3d 116, 121 (2d Cir.1997)).

Plaintiff's current Title VII retaliation claim is pled in fairly general terms and could be read as significantly broader than the claim that he asserted in his EEOC charge, which targeted only his referral for psychological evaluation and claimed that this action had been motivated by the appearance of an article in the *Daily News*. In his pleading in this case, plaintiff alludes very generally to other alleged acts of retaliation—that is, he asserts that he

---

basis to recommend the filing of charges, much less that any such insufficiency suggests racial or national-origin animus.

**23.** Although we conclude that defendants' challenge to these claims is merited, we also take note that defendants' counsel improperly places substantial reliance on the unreported Second Circuit decision in *Collazo v. City of New York*, 208 F.3d 202, 2000 WL 340398 (2d Cir.2000) (mem.). That decision was issued

under 2d Cir. § 0.23, which provides that when the court decides an appeal on the basis of a summary order, it "shall not be cited or otherwise used in unrelated cases before this or any other court." Despite this impropriety, we note that *Collazo* does not represent a change in any respect in the governing law; indeed, that is a necessary predicate for its consignment to a summary order.

was "continually threatened, harassed and brought up on unsubstantiated disciplinary [*sic.*]." (Am. Compl. at ¶ 89). He appears to assert that these adverse actions were undertaken to retaliate for various forms of protected activity, including unspecified criticisms of the Police Department and "supporting co-workers in their complaints against unlawful and protected [*sic.*] activities." (*Id.* at ¶ 88).

To the extent that the Department's alleged retaliatory steps against plaintiff preceded his filing of his EEOC charge, his current complaint about them as Title VII violations is barred by his failure to exhaust his administrative remedies. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001); *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 83 (2d Cir.2001). We may also read the amended complaint as asserting that actions taken against him by the Department after the filing of his EEOC charge were retaliatory. These actions include the Department's filing of charges and its conviction and sanctioning of him on those charges. Since these actions postdated the EEOC charge, plaintiff may assert them here without having first presented them to the EEOC. *See, e.g., Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1209 (2d Cir. 1993); *Hall v. City of New York,* 2002 WL 472057, at *2 (S.D.N.Y. Mar. 27, 2002).

Finally, we may also view plaintiff's retaliation allegations as an effort to assert a claim of constitutional dimension, that is, that defendants retaliated against him for exercising his First Amendment right of free speech. To sustain such a claim, which is not limited by a pre-suit exhaustion requirement, plaintiff is required to demonstrate that he engaged in activity protected by the First Amendment, that he suffered adverse action taken under color of state law, and that the adverse action was causally related to his exercise of his First Amendment rights. *See, e.g., Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d 775, 780–81 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). *See generally Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If, however, the plaintiff is a government employee, he cannot satisfy the first element unless he demonstrates that his speech was that of "a citizen on a matter of public interest" and not merely an employee's complaint about his own personal situation. *See, e.g., Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987); *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (quoting *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

With these criteria in mind, we address the various retaliation theories that are at least suggested by plaintiff's papers. We first discuss the only Title VII claim mentioned in the EEOC charge, which is based on the premise that plaintiff's referral for psychological evaluation was an adverse action taken in retaliation for the appearance of the *Daily News* article.

There are at least three problems with this scenario. First, at least for purposes of the Title VII claim, plaintiff fails to demonstrate that he engaged in protected activity as defined by the statute. A person's dealings with a newspaper reporter could conceivably qualify as "opposing any practice made an unlawful employment practice by Title VII"[24], *see Cruz,* 202

---

24. Talking to a reporter plainly does not constitute having "testified, assisted or participat-

F.3d at 566 ("opposition includes activities such as ' ... protesting against discrimination by industry or by society in general,'") (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)), but the *Daily News* article itself reflects no complaint by Bazile that he was being subjected to discrimination, much less of a type prohibited by Title VII. (*Daily News* article, Pltff's Ex. 16). Moreover, he offers no evidence suggesting that he made such Title VII-type complaints to the reporter. Second, plaintiff offers no evidence that the decision-maker who requested the psychological evaluation knew, when he made the request, that plaintiff had spoken to a reporter, much less that he knew that plaintiff had complained of discrimination.[25]

Third, plaintiff offers no evidence to demonstrate that the referral for psychological evaluation constituted an adverse employment action. As summarized by the Second Circuit, a qualifying adverse action by an employer "is a 'materially adverse change in the terms and conditions of employment.'" *Weeks*, 273 F.3d at 85 (quoting *Galabya v. New York City Board of Educ.*, 202 F.3d 636, 640 (2d Cir.2000)). The use of the term "materially adverse" indicates that the action must involve a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 85. The types of actions that

might meet this test include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* In any event, however, the challenged action must "affect[ ] employment in a way that is both detrimental and substantial." *Id.* at 87 (quoting *Bernheim v. Litt*, 79 F.3d 318, 327 (2d Cir.1996) (Jacobs, J., concurring)).

The rigorousness of this requirement is well illustrated by the Circuit Court's analysis in *Weeks*, in which the Court affirmed a dismissal of retaliation claims by a parole officer that were premised on such employer actions as issuance to her of a "Notice of Discipline" and a "Counselling Memo", the plaintiff's forcible transfer to another office, the seizure and review of her case files, the interviewing of her assigned parolees (apparently to assess her handling of them) and the reassignment of her cases to other parole officers. *Id.* at 86–87. The Court held, as a matter of law, that none of these steps could constitute an adverse employment action. *Id.*

Compared to these actions, the mere referral of Bazile for an evaluation—a step that plaintiff fails to show had any consequences for his working conditions—pales into insignificance. In this regard, certain of the comments of the Circuit Court in

ed in any manner in an investigation, proceeding or hearing under" Title VII. 42 U.S.C. § 2000e–3(a).

**25.** The gaps in plaintiff's case on this point are two-fold. First, there is no evidence as to when Chief Ziegler requested the evaluation. The only testimony pertinent to that question was by Lt. Barry, plaintiff's supervisor at the Brooklyn Court Section, who reported that he had found the directive in his in-box and had then made the referral on December 22, one day after the article appeared. When the decision was formulated and reduced to writing is unknown. Second, although plaintiff cites a set of handwritten notes to demonstrate awareness by the Department of the article, those notes—which apparently reflect comments by a Sgt. O'Brien in the Department's Advocate's Office—are dated January 8, 1998, several weeks after the psychological referral. (Pltff's Ex. 12). Third, as noted, the article does not contain any complaints about discrimination, and thus even if Ziegler had read the article before requesting the referral, he would not have known from it that Bazile had engaged in Title VII protected activity.

*Weeks* bear repeating. Addressing the "Notice of Discipline", the Court of Appeals observed that Weeks had alleged no facts from which it could be inferred that this notice had any serious effect on her working conditions, and it went on to note that "a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Id.* at 86 (citing *Smart v. Ball State Univ.,* 89 F.3d 437, 442–43 (7th Cir. 1996)). Similarly, with regard to the plaintiff's allegation that she had been physically removed from her office, the court relied upon the absence of any allegation suggesting that the removal, however unpleasant, had any "tangible adverse effect ... on the terms and conditions of [plaintiff's] employment." *Id.* at 87. As for the seizure and review of her files and the interviewing of her previously assigned parolees—apparently to determine whether she had acted improperly—the Court concluded that "this is precisely what a well-run office should do." *Id.*

In Bazile's case, all we know is that he was referred for a psychological evaluation and that he was presumably interviewed by someone on the staff of the Department's Psychological Services. (Bazile Dep. at 113–14). Absent any showing of a significant impact on his working conditions—or, indeed, any impact—this action by the Department falls into the category of steps that "a well run office should do" to ensure that its employees are capable of handling the demands of their job. *See Weeks,* 273 F.3d at 87.

In plaintiff's response to defendants' summary judgment motion, insofar as it targets his retaliation claim, he directly addresses only one form of retaliation— the referral for evaluation. (*See* Pltff's Memo at 13–14). The one other matter to which he refers, albeit only in passing, is that Lt. Thomas Barry, who supervised the Department's Brooklyn Court Section when plaintiff worked there on modified assignment, "overrule[d] plaintiff's immediate supervisor, lowering plaintiff's evaluation dated February 1, 1999." (*Id.* at 14). On the assumption that plaintiff may be seeking to invoke this action as a separate retaliatory act, we briefly address it.

Because Barry's written comments about Bazile postdated plaintiff's filing of an EEOC charge by more than one year, we ignore the fact that plaintiff never complained of this action to the EEOC. Nonetheless, this version of his Title VII retaliation claim must fail even if we assume that he could create a triable issue as to whether Barry acted as he did in retaliation for plaintiff's contact with the *Daily News* reporter.

As noted, plaintiff must demonstrate that he was subjected to an adverse employment action. The evidence of record concerning the evaluation form makes it clear that plaintiff cannot meet this requirement.

The evaluation, covering the period from December 16, 1997 to December 15, 1998, was prepared by plaintiff's immediate supervisor, Sgt. James Arniotes. The sergeant rated Bazile as having a "high degree of competency" in arranging "to have the prisoners under his supervision expeditiously arraigned," and commented very positively on Bazile's knowledge of arraignment procedures and the "Photo Imaging systems" used in the court, as well as his "ethics and integrity". For each of these categories, Arniotes also provided a set of numeric ratings. Finally, the sergeant added a very positive set of general comments, concluding that Bazile was "a conscientious member of the Brooklyn Court Section who strives in the mission to get prisoners under his supervision arraigned expeditiously. PO Bazile is an enthusiastic Police Officer who enjoys t[ ]o

learn new police procedures and strategies so he can accomplish his goal to pass the 1999 Sergeant's Exam." (Pltff's Ex. 1(Y)).

As the reviewer of this evaluation, Barry simply indicated on the form that he disagreed with one aspect of this evaluation. Thus he noted that "[a]lthough Officer Bazile is a capable worker, I would not rate him as highly efficient as this evaluation reflects." (*Id.*). In explanation for this notation, Barry testified at his deposition that Bazile, rather than being enthusiastic, seemed to him to be generally angry while at work. (Barry Dep. at 7, 10).

Plaintiff fails to show that Barry's notation, which amounts, at most, to a recalibration of the appraisal, had any consequences for his working conditions and responsibilities. In the absence of proof of a concrete impact—and there is none in the record before us—his showing fails, since Barry's assessment of Bazile is no more significant for Bazile's working conditions than the disciplinary report alluded to in *Weeks* was for Ms. Weeks.

Bazile's retaliation claim in this respect is also fatally defective for another reason—because he fails to create a triable issue as to Barry's motivation for making the notation. Plaintiff's assertedly protected activity—his contact with the *Daily News* and, arguably, his filing of an EEOC charge—occurred in December 1997 and January 1998, fourteen and thirteen months, respectively, before Barry made his notation. Apart from the length of time between the protected acts and the asserted adverse action, we note that plaintiff was evaluated under the same system in March 1998, only months after his dealings with the press and the EEOC, and that evaluation was even more favorable than that provided a year later, in 1999, and was not commented upon by the evaluation reviewer. (*See* March 10, 1998 Performance Evaluation, Pltff's Ex. 1(E)). In sum, there is simply no evidence of record to suggest that Barry was acting with retaliatory intent when he offered his less-than-enthusiastic but still favorable comment to the 1999 Performance Evaluation of plaintiff.

Finally, even if we were to interpret plaintiff's retaliation claim as premised on a First Amendment theory, it would fare no better. Although such a constitutional claim is not saddled with the Title VII requirement for administrative exhaustion, the plaintiff must demonstrate both that he was engaged in protected activity and that he suffered from an adverse action as a result. Plaintiff fails to meet either of these requirements.

As noted, neither the psychological assessment of plaintiff nor Lt. Barry's marginal comments on plaintiff's job evaluation reflect any adverse employment action. Although a plaintiff asserting a First Amendment claim may demonstrate retaliation based on adverse actions of a more diverse sort than are cognizable under Title VII, *see Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002); *Bernheim*, 79 F.3d at 324–25, plaintiff here proffers no evidence that he was subjected to adverse action beyond the employment context, and in that setting, the only acts to which he alludes had no demonstrated disadvantageous impact. Hence, it cannot be said that he was subjected to adverse action based on his purported protected activity.

Plaintiff also fails to show that his dealings with the *Daily News* reporter constituted activity protected by the First Amendment. As noted, a government employee who complains about retaliation for having uttered statements critical of his agency must demonstrate that his statements concerned a matter of public interest and did not constitute only complaints about his own treatment. *See Connick*,

461 U.S. at 147, 103 S.Ct. 1684; *Lewis v. Cowen,* 165 F.3d 154, 164 (2d Cir.), *cert. denied,* 528 U.S. 823, 120 S.Ct. 70, 145 L.Ed.2d 60 (1999); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). The only statements that plaintiff cites are those he made to the *Daily News* reporter, and the article reflects that he was complaining solely about his own situation—in particular, the extended time that he was serving on modified duty while the Department decided whether to file formal charges and specifications. That type of comment does not suffice to sustain a First Amendment retaliation claim. *See, e.g., Ezekwo,* 940 F.2d at 781; *Bates v. Bigger,* 192 F.Supp.2d 160, 172–73 (S.D.N.Y.2002).

We offer one other observation about plaintiff's retaliation argument. In his motion papers, plaintiff cites as retaliation only his psychological referral. Thus, he does not suggest, as he did in his amended complaint, that the Department's decisions to file charges and to find him guilty, as well as its sanctions decision, were motivated by his having engaged in protected activity, whether under Title VII or under the First Amendment. Even if he were to make that broader assertion, however, it would fail on the current record.

The evidence demonstrates, without contradiction, that the decision to file charges was made in early December 1997, prior to the publication of the article, and was made on the basis of Bazile's admitted conduct in discharging eleven bullets in a residential lobby while dealing with an unleashed dog. Although the charges were not actually filed until the following March, there is no evidence that would permit a trier of fact to conclude that this delay—or the decision as to which charges to file—were affected by the *Daily News* article. There is equally no evidence to suggest that the decision by the hearing officer, in which she found plaintiff guilty of the two filed charges and recommended a one-year probation, with loss of twenty vacation days, was a product of animus engendered by Bazile's contact with the newspaper rather than based on the evidence that she heard at the two-day trial over which she presided. Finally, for reasons already noted, Bazile's contacts with the reporter do not constitute protected activity under either Title VII or the First Amendment.

In sum, plaintiff's retaliation claims, as he articulates them, are deficient as a matter of law on the current evidentiary record. In reaching this conclusion, we also note that plaintiff's retaliation theory, even in its broadest possible form, could not be sustained. The various protests that plaintiff made about his treatment—all of which postdated the shooting incident and his placement on modified assignment— cannot be deemed to raise a triable issue as to retaliatory intent merely because plaintiff was thereafter found guilty of the charges lodged against him and sanctioned. Were it otherwise, any public employee against whom misconduct charges are being considered may assure himself either immunity from such charges or a triable retaliation claim by the simple stratagem of protesting the consideration of charges. In this case, there is no meaningful independent evidence of retaliatory intent, and the mere fact that the filing of charges and plaintiff's conviction on them followed his protests does not save the claim.

Accordingly, summary judgment should be granted in defendants' favor on these claims.

### E. *Plaintiff's Hostile–Environment Claim*

In plaintiff's complaint, he asserts a separate claim under Title VII for exposure to a hostile work environment. The factual

basis for this claim appears to be his assignment, while on modified duty, to the Brooklyn Court Section of the Department and his current walking-post assignment in the 33rd Precinct.

This claim fails for two reasons. First, plaintiff never asserted it in his charge to the EEOC, and he does not show the applicability of any recognized exception to the statutory requirement of administrative exhaustion. Second, plaintiff fails to proffer any evidence that the conditions at the Brooklyn Court Section or those of his current assignment ever amounted to a hostile work environment.

Before filing suit on a claim under Title VII, the plaintiff must first file an administrative charge with the EEOC and must do so within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In that charge, the plaintiff must ordinarily include any claim that he thereafter seeks to raise in court. *See, e.g., Legnani,* 274 F.3d at 686.

In Bazile's EEOC charge, which predated the Department's filing and determination of disciplinary charges, he was quite specific in articulating his allegations. Thus, he complained that he had been placed on an extended period of modified duty because of his race and national origin, that the Department had unnecessarily delayed the completion of its investigation for the same discriminatory reasons and that he had been referred for a psychological evaluation in retaliation for his public statement—as reported in the *Daily News*—in which he criticized the Department for not completing its investigation more promptly. In his charge, he made no reference to his work conditions, other than to the fact that he was not on regular duty, and he did not suggest in any way that his then-current assignment involved a hostile environment.

In short, plaintiff's charge did not assert a claim for a hostile work environment or otherwise alert the EEOC to plaintiff's current contentions that his then-current working conditions in the Brooklyn Court Section were so difficult as to amount to such a hostile environment. Absent the application of some exception to the exhaustion requirement, we cannot consider the claim.

In seeking to invoke such an exception, petitioner cites the fact that he prepared the charge himself, without the assistance of an attorney. Noting that the courts have applied to EEOC charges a variant of the liberal-construction principle that governs the interpretation of *pro se* pleadings, he argues that his failure to mention anything in his charge with regard to his current hostile-environment claim should be disregarded. (Pltff's Memo at 10).

This argument misses the mark. As a general matter, a Title VII plaintiff may assert in court those claims that were previously presented to the EEOC or that are "reasonably related" to the exhausted claims. *See, e.g., Legnani,* 274 F.3d at 686; *Shah v. N.Y. State Dep't of Civil Serv.,* 168 F.3d 610, 614 (2d Cir.1999); *Gomes v. Avco Corp.,* 964 F.2d 1330, 1334 (2d Cir.1992) (quoting *Kirkland v. Buffalo Bd. Of Educ.,* 622 F.2d 1066, 1068 (2d Cir.1980) (*per curiam* )). The Second Circuit has noted in this connection that when evaluating the scope of the "often inarticulately framed charge" of a *pro se* complainant, the court should "take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Gomes,* 964 F.2d at 1334 (quoting *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979), *rev'd on other gds.,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)). *Accord, Holtz,* 258 F.3d at 83; *Fitzgerald v. Henderson,* 251 F.3d 345, 359–360 (2d Cir.

2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2001).

The problem with plaintiff's argument is that his clearly stated EEOC charge was quite specific and offers no basis for inferring that the EEOC was likely to have considered the actual conditions of his work at the Brooklyn Court Section, much less to have assessed whether those conditions involved an abusive or hostile environment. In his charge, plaintiff complained of having been denied his regular assignment with the 28th Precinct and having been referred on one occasion for psychological evaluation, but he made no reference at all to working conditions in Brooklyn, much less indicated any unhappiness with how he was being treated there. In short, even liberally construed, his charge did not assert a claim that is reasonably related to his hostile-environment claim.[26]

Even if we ignored plaintiff's failure to exhaust his EEOC remedies, the result would not change. Plaintiff fails to proffer evidence sufficient to create a triable issue as to whether the conditions of his past assignment to the Brooklyn Court Section or his present assignment to walking posts in the 33rd Precinct were or are those of a hostile work environment.

To demonstrate the requisite workplace conditions, the plaintiff must show that he was exposed to "a[n] ... objectionable environment" of such severity that it " 'alter[ed] the conditions of the [his] employment and create[d] an abusive working environment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). To meet this test, plaintiff must establish that the work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In judging whether the workplace reflects the requisite abusiveness, the court must consider " 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* at 787–88, 118 S.Ct. 2275 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

---

**26.** We note as well that the "reasonably related" exception ordinarily encompasses only complaints about conduct that occurred after the claimant had filed his charge. *See, e.g., Butts v. City of New York Dep't of Housing Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993); *Malarkey*, 983 F.2d at 1209 (2d Cir. 1993). Plaintiff offers no suggestion that whatever actions caused the creation of a hostile environment in the Brooklyn Court Section occurred after his February 1998 EEOC filing. Indeed, in plaintiff's vague assertions about conditions in that unit, he plainly implies that whatever problems he encountered there were of longstanding duration. (Pltff's Rule 56.1 Statement at ¶ 17; Bazile Dep. at 188–89). This failing also precludes our consideration of the merits of the Brooklyn Court Section hostile environment claim. *See, e.g., Hall*, 2002 WL 472057, at *2 (citing cases).

While his claim of hostile work environment in his current position at the 33rd Precinct concerns matters that have occurred since his EEOC filing, it is at least arguable that that claim is not sufficiently related to the claims he made in his EEOC filing to excuse his filing separately for it now. Certainly, the previous EEOC investigation could not have been expected to consider his present environment. However, we need not decide this question because, as discussed below, plaintiff does not offer sufficient evidence on this claim to withstand defendants' summary judgment motion.

The most difficult part of such an analysis is, of course, the determination of whether the challenged conduct was sufficiently severe either in nature or in persistence to trigger statutory protection. As the Supreme Court has emphasized, the objective portion of the test is not satisfied by " 'simple teasing', ... offhand comments, and isolated incidents ...." *Id.* at 788, 118 S.Ct. 2275 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Nonetheless, "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*' " *Whidbee*, 223 F.3d at 70 (quoting *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997)) (emphasis added in *Whidbee* ). In the absence of a single incident that is "extraordinarily severe," *see, e.g., Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000), the plaintiff may demonstrate "that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* at 153 (quoting *Cruz*, 202 F.3d at 570).

In assessing a pattern of alleged misconduct, the court is not to impose a requirement that the plaintiff demonstrate "a threshold magic number of harassing incidents." *Richardson*, 180 F.3d at 439 (2d Cir.1999) (internal quotations omitted). " '[I]t is not how long the sexual innuendos, slurs, verbal assaults or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.' " *Whidbee*, 223 F.3d at 69 (quoting *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 578 (2d Cir.1989)). As noted, each case is unique, and the evaluation turns on all of the pertinent circumstances. *See, e.g., Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

Plaintiff's case on this claim fails because he has offered no evidence of an "objectionable environment" of such severity that it " 'alter[ed] the conditions of the [his] employment and create[d] an abusive working environment.' " *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275. Indeed, plaintiff offers only a few conclusory comments by him to the effect that the working environment in Brooklyn was viewed by him and others as undesirable (Pltff's Rule 56.1 Statement at ¶ 17; Bazile Dep. 188–89), and his testimony that he is currently at a dead-end job at which he is the butt of jokes from his fellow officers about having shot the dog.[27] (Pltff's Rule 56.1 Statement at ¶ 23; Bazile Dep. at 160–61, 165). He offers no evidence that even begins to focus on satisfying the applicable, and quite rigorous, standards. The self-serving generalities that he does offer do not substitute for the complete absence of any specific evidence of mistreatment based on racial or national-origin animus and hence cannot save his claim. *See, e.g., Whidbee*, 223 F.3d at 69; *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999); *Torres*, 116 F.3d at 630–31.[28]

**27.** Although plaintiff states in general terms that his fellow officers tease him about having shot the dog, he makes no claim that the teasing is based on racial or national-origin animus.

**28.** Plaintiff's failing in this respect further undermines his claim because he cannot establish a basis for holding the City liable for any misconduct of its employees. On a Title VII hostile-environment claim, the plaintiff also bears the burden of showing a factual basis for holding the employer liable for the alleged misconduct of its agents. If the misbehaving employee is a sufficiently high-level supervisor, and he uses his supervisory position to inflict the complained-of harm on the plain-

## F. Plaintiff's Due Process and Equal Protection Claims

In plaintiff's complaint he asserts in general terms that the misconduct of the defendants denied him due process and equal protection. We interpret these assertions as intended to form the predicate for claims under 42 U.S.C. §§ 1983, 1985(3). Although plaintiff's argument in support of these claims is quite vague, it appears that these allegations amount to a restatement of his discrimination claims. (*See* Pltff's Memo at 14, 21–22).

The short answer to plaintiff's equal-protection claims is that his failure to sustain his disparate-treatment claims is fatal to his parallel constitutional claims. The essence of an equal-protection claim based on race or national origin is that the plaintiff was "treated differently from other similarly situated employees, thus suffering 'disparate treatment because of'"

those characteristics. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998) (quoting *Saulpaugh,* 4 F.3d at 144). As the Court noted in *Annis,* "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims." *Id.* (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994)).

For reasons noted, plaintiff cannot establish a claim under Title VII. Necessarily, then, he cannot sustain a comparable claim under the Equal Protection Clause. For the same reason, he cannot prevail on a section 1985(3) claim, which also requires a demonstration of an intent to deprive a person of equal protection or "equal privileges and immunities". *See Brown v. City of Oneonta, New York,* 221 F.3d 329, 341,

---

tiff, the court will deem the proof of those facts sufficient to satisfy the plaintiff's initial burden of proof. *See Faragher,* 524 U.S. at 803, 118 S.Ct. 2275 *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Fitzgerald,* 251 F.3d at 357; *Ausfeldt v. Runyon,* 950 F.Supp. 478, 482–83 (N.D.N.Y.1997). That showing, however, is subject to rebuttal by the employer on the basis of an affirmative defense that the company "exercised reasonable care to prevent and correct promptly any ... harassing behavior and ... that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257. If the wrongdoing was by a non-supervisory employee or by a low-level supervisor, the factual issues dispositive of the employer's liability are generally the same. In such a case, however, it is the plaintiff's burden to demonstrate that " 'the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it.' " *Torres,* 116 F.3d at 633 (quoting *Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213,

114 S.Ct. 2693, 129 L.Ed.2d 824 (1994)); *Whidbee,* 223 F.3d at 72; *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992).

Absent any specific allegations by plaintiff of wrongdoing at the Brooklyn Court Section, we do not know whether any misdeeds were committed by senior supervisors there or by lower level employees. Thus we cannot determine where the burden of proof would lie as to the adequacy of the remedial process made available by the Department. With regard to his current assignment, plaintiff does indicate that fellow officers tease him, and therefore the burden would rest with him with regard to the existence and adequacy of the Department's remedial procedures. In any event, however, we note that Bazile concedes that he never sought to use that process, which is administered by the Department's Office of Equal Employment Opportunity, to protest the conditions at the Brooklyn Court Section and does not claim to have accessed the system in connection with his claims of a hostile work environment in his present assignment. (Bazile Dep. at 68–69). Neither does he make any effort to demonstrate the inadequacy of that remedy. These failings also doom his claim.

*reh'g & reh'g en banc denied,* 235 F.3d 769 (2d Cir.2000), *cert. denied,* — U.S. —, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087–88 (2d Cir.1993).

As for plaintiff's invocation of due process, he never identifies a pertinent legal theory, much less what evidence would support a separate due-process claim against any of the defendants. Furthermore, if he is arguing that the procedures afforded him in the disciplinary proceeding were deficient, his claim cannot be sustained. First, he makes no showing of a procedural violation in the administrative process sufficient to trigger due-process scrutiny.[29] Second, he could have pursued an Article 78 proceeding to correct such a violation, but failed to do so. *See, e.g., Munafo v. MTA,* 285 F.3d 201, 213 (2d Cir.2002) (citing *Campo v. NYCERS,* 843 F.2d 96, 101–02 (2d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988)). Accordingly, this claim too must fail.

### G. *Plaintiff's State–Law and Municipal–Law Claims*

Apart from his federal claims, plaintiff presses a parallel set of discrimination and retaliation claims under New York state and local law, and also asserts a defamation claim. None withstands scrutiny.

The New York Human Rights Law, N.Y. Exec. L. § 290 *et seq.,* and the New York City Human Rights Law, NYC Admin. Code § 8–502, provide protections to employees that are comparable in scope to those afforded under Title VII. Substantively, the legal standards by which Title VII claims are assessed apply as well in evaluating claims under New York state and local law. *See, e.g., Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1 (2d Cir. 1999); *Tyler v. Bethlehem Steel Corp.,* 958

F.2d 1176, 1180 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Browne v. CNN America, Inc.,* 1999 WL 1084236, at *2 n. 1 (S.D.N.Y. Dec. 1, 1999), *aff'd,* 229 F.3d 1135 (2d Cir.2000). *See generally Schlesinger v. New York City Transit Auth.,* 2001 WL 62868, at *11 (S.D.N.Y. Jan. 24, 2001). Since plaintiff's federal claims for disparate treatment, retaliation and hostile environment fail as a matter of law, necessarily the mirror-image state-law and municipal-law claims are equally subject to summary judgment. *See Cruz,* 202 F.3d at 565 n. 1; *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999); *Leopold,* 174 F.3d at 264 n. 1.

Finally, plaintiff's defamation claim fails both on procedural and on substantive grounds. Indeed, plaintiff does not actively contest defendants' motion insofar as it challenges this claim.

To the extent that plaintiff seeks to assert this claim against the City, he must comply with sections 50–e and 50–i of the New York General Municipal Law. Those provisions require, as a predicate to the assertion of a tort claim against the City, that the aggrieved party submit a notice of claim to the municipality within ninety days after the accrual of the claim. This requirement is intended to place the municipality on notice of the claim and to give it the opportunity to investigate the claim before litigation is commenced. *See, e.g., Pollicino v. New York City Transit Auth.,* 225 A.D.2d 750, 751, 640 N.Y.S.2d 168, 169 (2d Dep't 1996); *Messina v. Mazzeo,* 854 F.Supp. 116, 144–45 (E.D.N.Y.1994).

In defendants' motion, they assert that plaintiff never filed an administrative claim. (Defts' Memo at 18). Plaintiff does not contest this assertion, or even refer to

---

**29.** For purposes of this analysis, we assume *arguendo* that plaintiff can demonstrate an

entitlement tantamount to a property or liberty interest.

this claim, in his opposing papers, and we accordingly infer that he in fact failed to comply with the procedures mandated by the General Municipal Law. This is fatal to his claim, at least as against the City.

The one remaining question concerns whether plaintiff can still assert his claim against the individual defendants. Although section 50–i refers only to claims asserted against a municipality or its agencies, the New York courts have held that any tort claim pressed against a City official who would be entitled to indemnification by the City must be asserted in an administrative claim under the General Municipal Law. *See, e.g., International Shared Servs., Inc. v. County of Nassau*, 222 A.D.2d 407, 408, 634 N.Y.S.2d 722, 724 (2d Dep't 1995); *Broadmeadow Lanes, Inc. v. Catskill Régional Off–Track Betting Corp.*, 151 A.D.2d 631, 631, 543 N.Y.S.2d 91, 92 (2d Dep't 1989).

The provision governing indemnification by the City of New York is section 50–k of the General Municipal Law. It requires indemnification of a municipal employee if his liability arose from conduct "within the scope of his public employment and in the discharge of his duties", provided that the employee was "not in violation of any rule or regulation of his agency at the time the alleged damages were sustained" and that the injury did not arise "from intentional wrongdoing or recklessness on the part of the employee." N.Y. Gen. Mun. Law § 50–k(3).

Plaintiff complains that "defendants"— he does not specify which ones—defamed him by publishing a personnel order that recited his conviction and the sanction imposed, even though these disciplinary steps had assertedly been barred by order of the Article 78 court. There is no basis for inferring that the publication of the order violated any rule or regulation of the Department. As for possible intentional wrongdoing or recklessness, the waters

are muddied by plaintiff's imprecise labelling of the claim. If treated as a defamation claim, which is the label provided by plaintiff (Am. Compl. at Count 10), the claim would not require proof of intentional misconduct or recklessness, since liability for defamation requires only the negligent publication of a damaging falsehood. *See Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999); *see also* Restatement (Second) of Torts § 558 (1976). Confusion on this point, however, is created by the fact that plaintiff's factual allegations do not correspond to a defamation theory. At best, they might involve a claim of intentional infliction of emotional distress or perhaps some specie of *prima facie* tort, both of which would require a showing of intentional misconduct, or at least a disregard of a substantial probability of causing the complained-of harm in the case of the latter. *See Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324 (1984) (*prima facie* tort); *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993) (emotional distress). In that case, the individual defendants could not obtain indemnification, and hence the administrative-exhaustion requirement would not apply.

We need not solve this conundrum, however, since plaintiff's claim, however characterized, is plainly meritless. If treated as a defamation claim, it is defeated by the obvious fact that the challenged statements were truthful; all that the personnel order did was to describe, accurately, both the fact of plaintiff's disciplinary conviction and the sanction imposed. (*See* Defts' Ex. Y).

Alternatively, if we focus on plaintiff's articulated complaint—which rests on his contention that the disciplinary conviction and sanctioning were in violation of a state

court order and hence should never have been issued or mentioned by the Department—the result is the same. Plaintiff persists in arguing that Justice Wetzel prohibited the Department from issuing its disciplinary decision after October 23, 1998, and that since the final decision did not come until January 1999, it was illegal. The simple fact, however, is that Justice Wetzel's October 7, 1998 order did not preclude the Department from acting on the disciplinary charges after October 23. He simply directed that if the decision had not been issued by then, the Department was to restore plaintiff to regular duty. Indeed, plaintiff litigated this question before Justice Wetzel in a second Article 78 proceeding, in the Spring of 1999, and the judge dismissed his petition on the ground that his prior order had not precluded the Department from sanctioning plaintiff after October 23, 1998. (Defts' Ex. Z).

In sum, plaintiff's defamation claim, however characterized, is patently meritless. Accordingly, summary judgment should be entered in favor of defendants.

### CONCLUSION

For the reasons stated, we recommend that defendants' motion for summary judgment be granted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room 414, 40 Center Street, New York, New York, 10007 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *DeLeon v. Strack*, 234 F.3d 84, 86 (2d Cir.2000) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

May 10, 2002.